IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, NATIONAL LEAGUE OF UNITED LATIN AMERICAN CITIZENS, LEAGUE OF WOMEN VOTERS OF TEXAS, RALPH EDELBACH, and BARBARA MASON;<br><br>       Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, RUTH HUGHS, in her official capacity as Texas Secretary of State, DANA DEBEAUVOIR, in his official capacity as Travis County Clerk, CHRIS HOLLINS, in his official capacity as Harris County Clerk; JOHN W. OLDHAM, in his official capacity as Fort Bend County Elections Administrator; LISA RENEE WISE, in her official capacity as El Paso County Elections Administrator;<br><br>       Defendants. | Civil Action<br>Case No. \_\_\_1:20-cv-1006\_\_\_ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. On June 29, 2020, Defendant Governor Greg Abbott argued in federal court that "precipitous changes to the [election] rules can cause 'confusion' and even undermine public confidence in the outcome of the election itself."

2. Three months later, with voting underway in Texas, Governor Abbott made exactly the type of "precipitous change" that he had cautioned against. On October 1, 2020, Governor Abbott issued an order forcing county election officials to offer their absentee voters no more than one physical drop-off location at which to return their ballot. In the State's largest counties,

1

including Harris and Travis counties, the October 1 order meant that the number of drop off location would respectively be reduced from 11 and 4 locations.

3. For Texas' absentee voters—including those who had already requested or received their absentee ballot with the expectation that they would be able to use one of many drop-off locations offered by their county—the effect of the October 1 order is to unreasonably burden their ability to vote. They will have to travel further distances, face longer waits, and risk exposure to COVID-19, in order to use the single ballot return location in their county. And, if they are unwilling or unable to face these new burdens, they will have to rely on a hobbled postal mail system—that has expressed a lack of confidence in its own ability to timely deliver the mail—and hope that their ballot will be delivered in time to be counted. Inevitably, for some absentee voters, their hope will be misplaced, and their ballot will not be counted.

4. In the midst of an election that is already underway, forcing such new burdens on voters who relied on a different set of election rules to make their voting plan, is unreasonable, unfair, and unconstitutional. And, as Governor Abbott recently argued, it engenders voter confusion and undermines the public's confidence in the election itself.

5. This Court must therefore immediately enjoin Governor Abbott's October 1 order, and restore the status quo to Texas's already-occurring election.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

7. This Court has personal jurisdiction over Defendants, who are elected or appointed officials for the State of Texas or Texas Counties, and are residents of the State of Texas.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

9. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**PARTIES**

10. Plaintiff League of United Latin American Citizens ("LULAC") is the oldest and largest national Latino civil rights organization in the United States. LULAC is a non-profit membership organization with a presence in most of the fifty states, including Texas. It was founded with the mission of protecting the civil rights of Latinos, including voting rights. LULAC participates in civic engagement activity, such as voter registration, voter education, and voter turnout efforts, throughout the United States.

11. LULAC has been recognized and accepted as an organizational plaintiff protecting Latino rights in federal courts across the country, including the United States Supreme Court and the U.S. District Court for the Western District of Texas.

12. Plaintiff Texas LULAC is the Texas chapter of the League of United Latin American Citizens. Plaintiff Texas LULAC was founded in Texas in 1929. Texas LULAC has over 20,000 members across the state of Texas. Texas LULAC's members include registered voters who are eligible to and plan to vote absentee in the current general election.

13. Texas LULAC regularly engages in voter registration, voter education, and other activities and programs designed to increase voter turnout among its members and their communities. These efforts are key to LULAC's mission of increasing civic participation of its members. Texas LULAC commits time, personnel, and resources to these efforts throughout Texas.

14. In light of the coronavirus pandemic, many eligible Texas LULAC members intend to vote absentee rather than vote in person and risk exposure to COVID-19. And because of

widespread reports of mail delays in mail processed by the United States Postal Service, many Texas LULAC members have planned to drop off their ballots at one of the drop-off locations provided by, or planned to be provided by, Texas elections officials, to ensure their ballots are timely received an counted.

15. In light of the Governor's precipitous announcement that counties may only operate a single absentee ballot drop-off location, Texas LULAC will be forced to divert resources away from its ongoing efforts to mobilize its members and their communities to vote and towards educating voters about the impact of the Governor's order eliminating ballot drop-off locations and prohibiting counties from providing more than one location where voters can drop off their absentee ballots.

16. The League of Women Voters of Texas (LWVTX) is a nonprofit membership organization focused on nonpartisan, grassroots civic engagement. LWVTX's mission is to empower voters and defend democracy. LWVTX encourages its members and all Texans to be informed and active participants in government, including by registering and voting in local, statewide, and national elections. LWVTX has approximately 3,000 members in Texas, many of whom are eligible to vote absentee and plan to do so in the upcoming election, including by returning their absentee ballots to a drop box.

17. In light of the Governor's order limiting the number of absentee ballot drop-off locations to one per county, many Texas LULAC and LWVTX members will lack reasonable access to a drop-location and thus will be unable to timely cast their absentee ballots, absent federal court intervention. In-person voting is simply not an option for many absentee-eligible Texas LULAC and LWVTX members. Elderly, sick, and disabled members—the only categories of persons eligible to vote absentee by dropping off their ballot in person—simply cannot risk deadly

exposure to COVID-19. As such, absentee ballots are the only option for many eligible Texas LULAC and LWVTX members to exercise the franchise without jeopardizing their own health or the health of their families. Furthermore, given the well-reported delays in mail processed by the United States Postal Service, many Texas LULAC and LWVTX members will be denied the right to vote unless they travel long distances and wait in crowded lines (something they cannot do without risking their health) to drop off their ballots.

18. Ralph Edelbach is an 82-year old Texas voter who lives in Cypress, Texas. Mr. Edelbach plans to vote by mail in this November's election. Because of his concerns around whether the Postal Service will be able to timely and safely transmit his absentee ballot for counting, Mr. Edelbach planned to drop his ballot off at one of the eleven Harris County ballot return locations. Prior to Governor Abbott's October 1 order, the nearest drop-off location to Mr. Edelbach's home was about 16 miles away. That location has been forced to close by the Governor's order, and now, the nearest drop-off location to Mr. Edelbach will be about 36 miles away. As a result, if he wants to drop his ballot off in person—which is his preference—Mr. Edelbach will have to drive nearly an hour-and-a-half roundtrip in order to do so. Other voters in Harris County in similar circumstances have already dropped off their ballots at previously authorized return locations.

19. Barbara Mason is a 71-year-old Texas voter who lives in Austin, Texas. She is an annual absentee voter and plans to vote by mail in this November's election. Before Governor Abbott's October 1 order, Ms. Mason planned to use one of the four Travis County drop-off locations to return her absentee ballot because she is concerned that she will not have enough time to receive, consider, vote, and timely return her ballot by mail. Indeed, Ms. Mason is especially worried that given its recent mail delivery problems, the Postal Service will not be able to timely

and safely deliver her absentee ballot for counting. However, since the number of drop off locations in Travis County has been reduced to one, Ms. Mason is concerned about the logistical challenges that using the single location will pose. For example, Ms. Mason will need to drive approximately 30 minutes each way to drop off her ballot, as well as the time that she will need to spend waiting to reach the front of the drop off line. Ms. Mason is also concerned that by having to spend additional time trying to return her ballot at the single drop off location, she may be forced to unnecessarily expose herself to COVID-19. Other voters in Travis County in similar circumstances have already dropped off their ballots at previously authorized return locations.

20. Defendant Greg Abbott is the Governor of Texas and, pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas. He is sued in his official capacity.

21. Defendant Ruth Hughs is the Texas Secretary of State, and pursuant to Tex. Election Code § 31.001, is the chief election officer of the state. She is sued in her official capacity.

22. Defendant Dana DeBeauvoir is the Travis County Clerk and Election Administrator. She is sued in her official capacity.

23. Defendant Chris Hollins is the Harris County Clerk and Elections Administrator. He is sued in his official capacity.

24. Defendant John W. Oldham is the Fort Bend County Elections Administrator. He is sued in his official capacity.

25. Defendant Lisa Renee Wise is the El Paso County Elections Administrator. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

26. As this Court is well aware, America is living through an unprecedented pandemic. On March 13, 2020, outbreak of the pandemic disease caused President Trump to declare a national state of emergency, and Governor Abbott to declare a state of disaster in Texas. Both declarations remain in place to this day, and there is no discernible end to the public health crisis caused by COVID-19 in sight. And Texas has been among the hardest hit states in the country. Texas has had over 750,000 coronavirus cases and nearly 16,000 fatalities. Over 2,500 of those fatalities were in Harris County alone. The coronavirus crisis is not abating. One September 30, Texas reported a recent high of 5,335 new cases. On October 1, Texas reported 3,234 new cases and 115 deaths.

27. The dangers presented by COVID-19 affect everyone but do not fall evenly on all populations. While the Latino community only represents 39.7% of the Texas population overall, they represent over 56% of fatalities in Texas.

28. And the risk of coronavirus is well-known to be of particular concern for older voters, for whom it is too often deadly. Approximately 10,800 of the nearly 16,000 fatalities in Texas are among those 65 and older, a demographic that is categorically eligible to vote absentee and is expected to do so in record numbers this year in light of the serious risks in-person voting poses for older voters.

29. The State of Texas strictly limits who is eligible to vote absentee to the following categories: individuals who (1) will be away from their county on Election Day and during early voting; (2) are sick or have a disability; (3) are 65 years of age or older on Election Day; or (4) are confined in jail, but eligible to vote. Tex. Code §§ 82.001; 82.002; 82.003; 82.004. The Texas Supreme Court has held that lack of immunity to COVID-19 is not a "disability" under the Texas election code but "a voter can take into consideration aspects of his health and his health history

that are physical conditions in deciding whether, under the [COVID-19] circumstances, to apply to vote by mail because of disability."

30. All restrictions on absentee voting impact only those eligible to vote absentee. And restrictions on in-person drop-off locations for absentee ballots affect *exclusively* older, or sick voters, and voters with disabilities that prevent them from voting in person. These individuals already face barriers to voting that are seriously exacerbated by the COVID-19 crisis.

31. In ordinary times, Texas only allows an absentee ballot to be delivered by one of three means: (1) mail; (2) common or contract carrier; or (3) in person at an early voting clerk's office *"only while the polls are open on election day."* Tex. Elec. Code 86.0006(a), (a-1).

32. On July 27, 2020, Governor Abbott issued an executive order recognizing that having such limited drop-off options for absentee voters was not viable or desirable given the dramatic rise in absentee voting expected for the November 3, 2020 election. In order to "ensure that elections proceed efficiently and safely when Texans go to the polls" this election cycle, Governor Abbott extended in-person early voting to begin on October 13, 2020 instead of October 19, 2020.

33. In the same order, Governor Abbott suspended the restriction in Texas Election Code 86.006 that only allows in-person delivery of absentee ballots on Election Day: "I further suspend Section 86.006(a-1) of the Texas Election Code, for any election ordered or authorized to occur on November 3, 2020, to the extent necessary to allow a voter to deliver a marked mail ballot in person to the early voting clerk's office prior to and including on election day."

34. In so doing, the Governor specifically found that "Sections 85.00 1(a) and 86.006(a-1) of the Texas Election Code [the in-person delivery restriction] would prevent, hinder, or delay necessary action in coping with the COVID-19 disaster[.]"

35. Since July 27, 2020, election officials and voters have made their election administration and voting plans accordingly.

36. In recent days, absentee voting has begun in earnest. Local election officials began sending out absentee ballots to voters in September.

37. In accordance with the Governor's order and to ensure safe and accessible voting for all Texans, counties had begun to roll out multiple absentee voting drop-off locations, particularly in counties that are both geographically large and populous. County election officials were designing plans to ensure that absentee voters will have reasonable access to those locations and that drop-off locations will not be overcrowded, which would pose a serious risk for absentee voters. By definition, absentee voters dropping off their ballots in-person are older, sick, or have disabilities that prevent them from voting in person, and thus at particularly high risk of COVID-19. Importantly, the public has been planning to use these locations. Now, hundreds, if not thousands of voters, have already utilized them. In some counties, lines have already formed during working hours to drop off voted ballots.

38. Harris County was among the earliest counties to act. By August, it had established that its 11 drop-off locations open on Election Day for the July elections would be operational for absentee ballot drop-offs "beginning whenever [voters] receive their ballots and continuing through Election Day, November 3, at 7:00 PM." Over 4 million Texans reside in Harris County, which spans about 1,777 square miles. Harris County is a majority-minority county. Over 40% of residents identify as Latino and almost 20% of residents identify as Black.

39. Earlier today, October 1, Travis County followed suit announcing the open of four drop-off locations. Over 1.2 million Texans reside in Travis County, which spans about 1,023

square miles. Travis County is also very diverse, with a population that is approximately one-third Latino and over 8 percent Black.

40. And just minutes before the Governor issued his executive order, Fort Bend had announced its plan to open several absentee ballot drop-off locations. Over 500,000 Texans live in Fort Bend, which spans about 885 square miles. Fort Bend is a majority-minority community. Together, the Latino, Asian, and Black communities of Fort Bend make up over 60 percent of the population.

41. Upon information and belief, there have been no security issues with these drop-off locations, all of which have been staffed with authorized election officials capable of checking voters' identification, as required by Texas Election Code 86.006(a-1).

42. Upon information and belief, absent Governor Abbott's order, other diverse, populous, and physically expansive counties would establish more than one drop-off location to ensure equal and safe access to drop-off locations.

43. However, on October 1, 2020, Governor Abbott issued an executive order precipitously requiring the closure of any absentee ballot drop-off locations in excess of *one location per county* as of October 2, 2020 and prohibiting the establishment of any absentee ballot drop-off locations in excess of one per county. The order also requires the early voting clerk to allow poll watchers to observe, in accordance with all applicable laws and regulations, the absentee voting by drop-off process, including the presentation of identification.

44. Upon information and belief, election officials were given *no notice* that they would be required to change their election operations in under 24 hours.

45. Indeed, election officials had no reason to question their election plans. Just yesterday, Texas Attorney General Ken Paxton submitted a brief to the Texas Supreme Court on behalf of Defendant Hughs stating:

> Finally, the Court asks whether, "in light of the Governor's July 27, 2020 proclamation, . . . allowing a voter to deliver a marked mail ballot in person to any of [the] eleven annexes in Harris County violates Texas Election Code section 86.00[6](a-1)." The Government Code generally provides that the singular includes the plural. *See* Tex. Gov't Code § 311.012(b). Nothing in section 86.006(a-1) overcomes that presumption or otherwise indicates that "office," as used in section 86.006(a-1), does not include its plural, "offices." Accordingly, the Secretary of State has advised local officials that the Legislature has permitted ballots to be returned to any early-voting clerk office. *See* Attachment B (email dated Aug. 26, 2020).

46. Thus, Governor Abbott's October 1 executive order does not merely suspend section 86.006(a-1) but concurrently *adds* a one-location-per-county rule that the Texas Attorney General admits is incongruous with the statutory text.

47. Governor Abbott's October 1 order did *not* determine any change in circumstances surrounding the COVID-19 pandemic and the need to increase voting options in response. Indeed, Governor Abbott reiterated his finding that "strict compliance with the statutory requirements in Sections 85.001(a) and 86.006(a-l) of the Texas Election Code would prevent, hinder, or delay necessary action in coping with the COVID- 19 disaster[.]"

48. Governor Abbott's order provides no justification for the sudden imposition of this harsh restriction except an *ipse dixit* statement that it is "appropriate to add ballot security protocols for when a voter returns a marked mail ballot to the early voting clerk's office[.]" But the Governor identified no security benefit to restricting the number of properly staffed ballot drop-off locations in a county and indeed there is none.

49. This order comes while absentee voting, including at drop-off locations, is already in progress and voters like Plaintiffs Edelbach and Mason, as well as many Texas LULAC and LWVTX members, have already made their voting plans.

50. The impact of this eleventh-hour decisions is momentous, targets Texas' most vulnerable voters—older voters, and voters with disabilities—and results in wild variations in access to absentee voting drop-off locations depending on the county a voter resides in. It also results in predictable disproportionate impacts on minority communities that already hit hardest by the COVID-19 crisis.

51. Officials in Harris and Travis counties have made clear the negative impact this will have on their voters. In a statement, Harris County Clerk Chris Hollins stated:

> The Governor's previous proclamation gave voters more options to vote safely during the global pandemic and alleviated concerns over mail delivery to ensure that every vote is counted. I applauded that proclamation. Going back on his word at this point harms voters and will result in widespread confusion and voter suppression. Many mail ballots have already been dropped off by voters across Harris County, and multiple drop-off locations have been advertised for weeks.
>
> Our office is more than willing to accommodate poll watchers at mail ballot drop-off locations. But to force hundreds of thousands of seniors and voters with disabilities to use a single drop-off location in a county that stretches over nearly 2,000 square miles is prejudicial and dangerous.

Travis County Clerk Dana DeBeauvoir has rung similar alarm bells about the impact on her county.

52. The ten largest counties by total land area in the State of Texas are all predominantly minority counties. The largest, Brewster County, is 45.2% Latino, the second largest, Pecos County, is 69% Latino, the third largest, Hudspeth County, is 76.9% Latino, the fourth largest, Presidio County is 82% Latino, the fifth largest, Culberson County is 72.9% Latino, the sixth largest, Webb County is 95.4% Latino, the seventh largest, Val Verde County is 82.3% Latino, the eight largest, Crockett County, is 66% Latino, the ninth largest, Reeves County, is

74.6% Latino, and the tenth largest, Terrell County, is 51.4% Latino. The percentage of Latino residents in each of these counties is notably larger than the percentage statewide, which is only 39.7%.

53. Similarly, seven out of the ten most populous counties in the state have a higher percentage of either Latino or Black residents than the state average.

54. Harris County, the state's most populous county, is 43.7% Latino and 20% Black. It is also home to 25% of Black residents and 18% of the state's Latino population. Governor Abbott's recent order reduced the number of absentee ballot drop-off locations in Harris County from 11 to 1.

55. Travis County is the fifth most populous county in the state, and is 33.6% Latino and 8.9% Black. Prior to Governor Abbott's order, Travis County voters could drop off their absentee ballots at 4 different locations. That number has now been reduced to 1.

56. Texas's other heavily populated counties are also likely to be disproportionately impacted by the drastic limit on drop-box locations. Given the demographics of theses counties, this impact is likely to fall disproportionately on Black and Latino voters. For example, the second most populous county, Dallas County, is 40.3% Latino and 23.6% Black. The third most populous county, Tarrant County, is 29.5% Latino and 17.9% Black. The fourth most populous county, Bexar County, is 60.7% Latino and 8.6% Black. The eighth most populous county, Hidalgo is 92.5% Latino. The ninth most populous county, El Paso County, is 82.9% Latino and 4% Black. Finally, the tenth most populous county, Fort Bend County, is 24.9% Hispanic or Latino and 21.3% Black.

57. The importance of drop-off locations for absentee ballots for voters in these counties, and across Texas, cannot be overstated. This is particularly so given the current pandemic

conditions that make it especially dangerous for elderly voters and voters with disabilities that prevent them from voting in person—the only voters affected by the October 1 order—and U.S. Postal Service recommendations that cannot guarantee timely delivery of absentee ballots on the timeline provided by Texas statute.

58. Under Texas law, voters can request absentee ballots until 11 days before Election Day. Those absentee ballots must be *received* by Election Day under Texas law, although mailed ballots that are postmarked by 7:00 p.m. on Election Day will be accepted if received by elections officials by 5:00 p.m. the next day.

59. But the U.S. Postal Service (USPS) recommends that that voters request mail-in ballots no later than 15 days before Election Day. Thus, there is a four-day gap between Texas law and USPS guidelines wherein U.S.P.S. will not promise timely delivery of absentee ballots. As a result, Texas voters will receive their absentee ballots after it is too late for them to safely return them by mail and be confident they will be counted.

60. Moreover, USPS has experienced substantial and high-profile delays in service in recent months, sparking several lawsuits concerning USPS's readiness to deliver voters' ballots in a timely fashion. These delays—which have occurred in Texas as well as across the country—have understandably shaken some voters'—including Plaintiffs Edelbach's and Mason's—confidence in leaving their vote in the hands of USPS. These voters seek to drop off their absentee ballots in-person at one of the locations established by their counties. But, under Governor Abbott's order, many of these locations will be unjustifiably shuttered leaving voters with wildly different access to absentee voting drop-off locations depending on the county they reside in.

61. The Fifth Circuit has recently cautioned against changes to election processes this late in the election calendar, including a decision just yesterday. This change is an affront to recent Fifth Circuit precedents involving the state's election rules.

## CAUSES OF ACTION

### Count 1
### Violation of Plaintiffs' Fundamental Right to Vote
### First and Fourteenth Amendments
### 42 U.S.C. § 1983

62. Plaintiffs reallege the facts set forth in paragraphs 1-61 above.

63. "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440–41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. See *Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886)).

64. When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

65. When a burden on the right to vote is severe or discriminatory, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

66. Texas LULAC and LWVTX members, as well as individual Plaintiffs, in Texas have a fundamental right to vote under the First and Fourteenth Amendments to the Constitution of the United States. Where the operation of an election law is alleged to cause a deprivation of such a fundamental right, the court "must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff seeks to vindicate against eh precise interest put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

67. Texas's limit on absentee ballot drop-boxes ensures that many disabled and elderly voters—who cannot safely vote in person—will have to travel long distances and suffer crowded drop-off locations in order to drop off their absentee ballots. And for those who receive their absentee ballots close to Election Day, they will not be able to return those ballots by mail with any confidence they will be counted.

68. Governor Abbott has provided no meaningful justification for the one-per-county limit on drop-off locations. The limit advances no security goals, despite Governor's unexplained invocation of security in the October 1 order.

69. The limitation on absentee ballot drop-off locations unconstitutionally burdens the fundamental right to vote of Texas voters who have a right to vote by absentee, including individual Plaintiffs and Texas LULAC and LWVTX members, in violation of the First and Fourteenth Amendments to the Constitution.

**Count 2
Arbitrary Disenfranchisement in Violation of the
Fourteenth Amendment to the United States Constitution
42 U.S.C. § 1983**

70. Plaintiffs' repeat and reallege paragraphs 1-61 above.

71. "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v Gore*, 531 U.S. 98, 104-05; *see also id.* at 106 (finding that voting procedures that "vary not only from county to county but indeed within a single county" are not "sufficient [to] guarantee[] equal treatment"); *see, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

72. Defendants' insistence that every county in Texas provide only a single absentee ballot drop box—regardless of geographical size or population—*requires* that counties provide voters with disparate access to the franchise. Texas's 254 counties vary dramatically in both physical size and population. The use of county lines as the delineation for the number of voting resources that may be provided is therefore arbitrary. As a result of the October 1 order, eligible absentee voters like Plaintiffs Edelbach and Mason, as well as Texas LULAC and LWVTX members, will face disparate burdens on their right to vote based entirely on which county the voter lives in, or on *where* they live in a particular county in relationship to the single absentee ballot drop box allowed under Defendants' order.

73. Defendants' elimination of absentee ballot drop-off locations and limit of such drop-off locations to one per county cannot withstand even rational basis review.

17

74. Defendant's elimination of absentee ballot drop-off locations limit of such drop-off locations to one per county *requires* arbitrary treatment of voters, creates disparate burdens on voters across and within counties, and allows arbitrary disenfranchisement all in violation of the Equal Protection Clause of the Fourteenth Amendment.

### Count 3
### Race and Language Minority Discrimination, Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301

75. Plaintiffs reallege the facts set forth above in paragraphs 1-61.

76. Texas's Latino voters are particularly susceptible to contracting and dying from COVID-19. Latino voters' increased susceptibility to the dangers of COVID-19 is directly tied to social and historical conditions stemming from discrimination.

77. Texas's limit of one-per-county for absentee ballot drop-off locations will have a disproportionate impact on absentee-eligible Texas LULAC members and other Latino voters living in densely populated counties like Harris and Travis, and in large but geographically dispersed counties like Webb, who wish to cast an absentee ballot without subjecting themselves to the risk of contracting COVID-19 or the risk that their mailed ballot will arrive too late to be counted.

78. Texas's arbitrary one-per-county limit on ballot drop-off locations violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because it results in the denial of the right to vote on account of race and language minority status, insofar as, under the totality of the circumstances, LULAC Plaintiffs and minority voters are denied an equal opportunity to participate effectively in the political process.

79. Texas's limits on absentee drop-off locations violate Section 2 because they deny and abridge the right to vote on account of race and language minority status.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

    a.    Issue a declaratory judgment that Governor Abbott's October 1 order limiting absentee voting drop-off locations to one per county violates the First and Fourteenth Amendments and the Voting Rights Act;

    b.    Grant preliminary and permanent injunctive relief restraining Defendants Abbott and Hughs from enforcing, and the Defendant County Election Officials from implementing, Governor Abbott's October 1 order limiting absentee voting drop-off locations to one per county;

    c.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Voting Rights Act and the Civil Rights Attorneys Fees Awards Act, 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988.

    d.    Grant such other equitable and further relief as the Court deems just and proper, and as may be necessary to afford Plaintiffs the fully relief to which they are entitled under the United States Constitution and the Voting Rights Act.

Dated: October 1, 2020

Respectfully submitted,

    /s Chad Dunn

| | |
|---|---|
| Danielle Lang* | Chad W. Dunn (Tex. Bar No. 24036507) |
| Mark P. Gaber* | Brazil & Dunn |
| Ravi Doshi* | 4407 Bee Caves Road |
| Molly Danahy* | Building 1, Suite 111 |
| Caleb Jackson* | Austin, TX 78746 |
| Campaign Legal Center | (512) 717-9822 |
| 1101 14th Street NW, Suite 400 | chad@brazilanddunn.com |
| Washington, DC 20005 | K. Scott Brazil (Tex. Bar No. 02934050) |
| Tel.: (202) 736-2200 | 13231 Champion Forest Drive, Suite 406 |
| dlang@campaignlegalcenter.org | Houston, TX 77069 |
| mgaber@campaignlegalcenter.org | (281) 580-6310 |

19

scott@brazilanddunn.com

cjackson@campaignlegalcenter.org
rdoshi@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org

*Pro Hac Vice* Forthcoming


Luis Roberto Vera, Jr.
LULAC National General Counsel
The Law Offices of Luis Vera Jr., and Associates
1325 Riverview Towers, 111 Soledad
San Antonio, Texas 78205-2260
(210) 225-3300 (office)
(210) 225-2060 (fax)
lrvlaw@sbcglobal.net