# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*, <br><br> Defendants. | Civil Action No. 1:20-cv-1006-RP |

## PLAINTIFFS' *EMERGENCY* MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Danielle Lang*
Mark P. Gaber*
Ravi Doshi*
Molly Danahy*
Caleb Jackson*
CAMPAIGN LEGAL CENTER ACTION
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200

Chad W. Dunn (Tex. Bar No. 24036507)
BRAZIL & DUNN
4407 Bee Caves Road
Building 1, Ste. 111
Austin, TX 78746
(512) 717-9822

*Motions for admission *pro hac vice* pending

Luis Roberto Vera, Jr.
LULAC National General Counsel
The Law Offices of Luis Vera Jr., and
Associates
1325 Riverview Towers, 111 Soledad
San Antonio, Texas 78205-2260
(210) 225-3300

K. Scott Brazil (Tex. Bar No. 02934050)
BRAZIL & DUNN
13231 Champion Forest Drive
Suite 406
Houston, TX 77069
(281) 580-6310

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 1

   I.   The Governor's July 27 Order Expanding Early Voting Days and Permitting Absentee
       Ballot Drop-Off Prior to Election Day ................................................................ 1

   II.  October 1 Order ..................................................................................................... 3

   III. The Burden on Voters ........................................................................................... 4

   IV. USPS Delays .......................................................................................................... 6

   V.  No Security Interest in Restricting Number of Ballot Drop-off Sites ................. 8

   VI. Sudden Burdens on Election Officials ................................................................. 9

ARGUMENT ................................................................................................................... 9

   I.   Plaintiffs Are Likely to Succeed on the Merits of their First and Fourteenth
       Amendment Claim of Discriminatory, Undue Burdens on the Right to Vote. ................. 10

       A.  The Governor's Order Imposes a Significant and Discriminatory Burden on
           Voters ........................................................................................................... 12

           1.   The Governor's Order Imposes Significant and Unnecessary Burdens on
                Voters ................................................................................................... 12

           2.   The Governor's Order Imposes Discriminatory Burdens on Voters. ................. 15

          B.  The Governor's Order Also Worsens Election Officials' Administrative Burdens
           and Complicates their Effort to Provide a Safe and Secure Ballot Return Process... 19

          C.  The Governor's Order Is Not Justified By Its Purported Interest In Advancing
           Election Security ......................................................................................... 21

   II.  Plaintiffs Are Likely to Succeed on their Equal Protection Claim. .................................. 23

   III. Plaintiffs Will Be Irreparably Harmed if the Governor's Order Is Not Enjoined. ............ 27

   IV. The Balance of the Equities Weighs in Favor of Plaintiffs. ............................................ 28

CONCLUSION ................................................................................................................. 29

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs respectfully move the Court for a temporary restraining order and preliminary injunction on Counts 1 and 2 of their Complaint to enjoin Defendants from enforcing the portion of Governor Abbott's October 1, 2020 Executive Order (the "Governor's Order") limiting Texas county election officials to providing voters with just *one* absentee ballot drop-off site per county. Because of the urgency of this matter, Plaintiffs request that the Court enter a temporary restraining order to remain in effect pending a hearing and resolution of Plaintiffs' motion for a preliminary injunction, in order to return to the status quo *ex ante*—prior to issuance of the October 1 Order—pending the Court's consideration of this case.[1]

The Governor's Order forced counties election administrators to close—with less than a day of notice—any additional drop-off sites, even though they were already in use and had been advertised to voters, based solely on unexplained "security" concerns that have no basis in fact. That action violates Plaintiffs' First and Fourteenth Amendment rights by posing an undue—and arbitrarily unequal—burden on their right to vote that is not justified by any state interest.

## FACTUAL BACKGROUND

### I.   The Governor's July 27 Order Expanding Early Voting Days and Permitting Absentee Ballot Drop-Off Prior to Election Day

On July 27, 2020, Governor Greg Abbott issued an Executive Order—using his emergency powers—extending the number of early in-person voting days by one-week in order to allow election officials to "implement appropriate social distancing and safe hygiene practices," and as

---

[1] As evidenced in the Certificate of Service, Plaintiffs' counsel have provided notice to Defendants' counsel of this Motion, and have provided declarations demonstrating the immediate and irreparable harm that will result to movant if a temporary restraining order is not expeditiously entered pending resolution of Plaintiffs' motion for a preliminary injunction. *See* Fed. R. Civ. P. 65(b)(1)(A) & (B).

1

relevant here, providing that Texas absentee voters could "deliver a marked mail ballot in person to the early voting clerk's office prior to and including on election day." Ex. 1 (July 27 Order). In issuing the Order, Governor Abbott stated that "it is necessary that election officials implement health protocols to conduct elections safely and to protect election workers and voters," and that "strict compliance with the statutory requirements . . . of the Texas Election Code would prevent, hinder, or delay necessary action in coping with the COVID-19 disaster." *Id.*

In light of Governor Abbott's July 27th order, multiple Texas Counties either opened or planned to open mail-in ballot drop-off locations at early voting clerk's offices throughout their respective counties. The Harris County Clerk, for example, opened 11 locations for voters across the county to drop off their mail-in ballots, *see* ECF No. 8 ("Hollins Decl.") ¶ 14, the Travis County Clerk opened 4 locations, Ex. 15 (Travis County Social Media) and the Fort Bend County Clerk announced that his office would soon be opening multiple locations, Ex. 16 (Fort Bend Statement). Defendant Hughs took no issue with county clerks opening multiple absentee ballot return locations, and instead, explicitly advised county clerks that it was permissible. Indeed, on September 30, 2020, the State of Texas told the Texas Supreme Court that, "the Secretary of State has advised local officials that the Legislature has permitted ballots to be returned to any early-voting clerk office." Ex. 2 (SOS Brief) at 5. Similarly, no other Defendant in this litigation raised *any* ballot integrity concerns about county clerks opening multiple absentee ballot return locations, despite knowing of counties' intention to do so since shortly after the July 27 order was issued,[2]

---

[2] *See,* Shelley Childers, *Harris Co. Clerk Responds to Mail-In-Ballot Warning from USPS*, ABC13 (August 14, 2020) (noting that Harris County would have 11 annex offices open to accept voters' absentee ballot in advance of November 3), https://abc13.com/2020-election-mail-in-ballot-usps-mailing-fraud/6371514/.

and despite knowing that for the July 14, 2020 primary election, at least some county clerks had also made multiple ballot return locations available (albeit only on Election Day itself).[3]

## II.     October 1 Order

On October 1—one day after the Secretary advised the Supreme Court of Texas that voters could lawfully return their absentee ballots to any early-voting clerk office in the county, and just a few minutes after the Fort Bend County Clerk announced additional drop-off sites—Governor Abbott issued an Executive Order limiting each county to "a single early voting clerk's office location that is publicly designated by the early voting clerk." Ex. 3 (Oct. 1 Order).  Governor Abbott justified this change as being, "appropriate to add ballot security protocols for when a voter returns a marked mail ballot to the early voting clerk's office." *Id.* But no added "security protocols" are actually included in the Governor's Order.

The Governor's Order gave Harris and Travis counties less than 24 hours-notice to close their satellite ballot drop-off locations. The order did not explain how limiting the number of ballot drop-off locations meshed with its stated goal of "using the least restrictive means to protect the health and safety of Texans." Ex. 3 (Oct. 1 Order). And, because it was issued *after* voting was *already underway* across the state, the order also had to clarify that any absentee ballot delivered to a satellite drop off location prior to October 2, 2020 would "remain subject to the July 27, 2020 proclamation," *i.e.*, countable. *Id.*

---

[3] *See, e.g.*, *Voters Can Drop Off Their Voting by Mail Ballots at These 11 Locations Across Harris County on Election Day*, KPRC2 (July 14, 2020) (identifying the 11 absentee ballot return locations open in Harris County on July 14, 2020), https://www.click2houston.com/news/local/2020/07/14/voters-can-drop-off-their-vote-by-mail-ballots-at-these-11-locations-across-harris-county-on-election-day/.

### III.     The Burden on Voters

This Order will impose burdens on eligible absentee voters, including individual Plaintiffs and Organizational Plaintiffs members. *See, e.g.*, Ex. 10 (Edelbach Dec.); Ex. 11 (Mason Dec.); Ex. 17 (Chimene Dec.); Ex. 12 (Golub Dec.); and Ex. 18 (Berg Dec.); *see also* Ex. 19 (Smith Report) ¶¶ 19-25, 28-32; Ex. 20 (Barreto Report) ¶¶ 30-44. Furthermore, the burdens faced by voters will vary significantly, based solely on what county they live in and where in the county they live. *See, e.g.*, Ex. 19 (Smith Report) ¶¶ 43-48.; Ex. 20 (Barreto Report) ¶¶ 30-44.

Harris County has 4,713,325 people—more people than 26 states, Puerto Rico, and the District of Columbia—spread over 1,800 square miles. Travis County has 1,273,954 people— more people than 8 states and the District of Columbia—spread over nearly 1,000 square miles. Fort Bend County has 811,688 people—more than 4 states and the District of Columbia—spread over 850 square miles. The average commute time for workers is 32.9 minutes in Fort Bend County, 29.2 minutes in Harris County, and 25.4 minutes in Travis County. Ex. 4 (Commute Time Data).

According to Houston County Clerk Christopher Hollins, traveling from Harris County's northwest corner to the current location of the main election office is more than a 100-mile round trip. ECF No. 8-1 (Hollins Dec.) ¶ 4. Harris County is in the fifth largest metropolitan statistical area (MSA) in the United States.[4] As a result, Harris County often has "extreme traffic congestion," such that a trip to and from Harris County's sole location for mail-in ballot drop-off "can easily take at least half a day by car and all day by public transportation (if any public transportation is available in the voter's home area)." ECF No. 8-1 (Hollins Dec.) ¶ 4.

---

[4] U.S. Census Bureau, *New Census Bureau Estimates Show Counties in South and West Lead Nation in Population Growth*, https://www.census.gov/newsroom/press-releases/2019/estimates-county-metro.html#table6 (last visited Oct. 5, 2020).

Harris County is the third most populous county in the country, behind only Los Angeles County, California and Cook County, Illinois. Cook County currently has 53 drop-boxes for mail ballots.[5] Los Angeles County has over 400 drop boxes.[6] In Maricopa County, Arizona, the fourth most populous county in the country, voters can return their mail ballots at any one of the 175 Vote Centers located across the county, or at any of 17 absentee ballot drop boxes.[7] Even Miami-Dade County, Florida, the seventh most-populous county in the nation, with nearly 2 million fewer people than Harris County, allows voters to return their absentee ballots at any one of its 33 early voting locations across the county,[8] as well as at the Elections Department's physical address, and the Election Department's branch office.[9]

The inadequacy of one drop-off site per county in counties such as Harris County is further belied by the Election Assistance Commission's guidance that there should be a drop off location for every 15,000 to 20,000 registered voters and recommends using different formulas for rural and urban areas to address travel burdens as well.[10] Even adjusting Harris County's over 2 million

---

[5]   Cook   County,   Ill.   Clerk,   Mail   Ballot   Drop   Box   Locations, https://www.cookcountyclerk.com/service/mail-ballot-drop-box-locations (last visited Oct. 4, 2020).

[6]   Los   Angeles   County   Registrar-Record/County   Clerk,   Vote   by   Mil   Drop-Off, https://www.lavote.net/home/voting-elections/voting-options/vote-by-mail/vbm-ballot-drop-off (last visited Oct. 4, 2020).

[7]   Maricopa   County   Elections   Dep't,   Where   do   I   vote?,   https://recorder.maricopa.gov/ pollingplace/ (last visited Oct. 4, 2020).

[8]   Miami-Dade County Supervisor of Elections, Early Voting Schedule and Official Ballot Drop Box   Information   for   the   11/03/2020   General   Election,   https://www.miamidade.gov/ elections/library/2020-general-early-voting-schedule.pdf (last visited Oct 4, 2020).

[9]   Miami-Date County Supervisor of Elections, Vote-By-Mail Ballot Return Policy, https://www.miamidade.gov/elections/library/instructions/vote-by-mail-ballot-return-policy-en.pdf (last visited Oct. 4, 2020).

[10]   Election Assistance Comm'n, Cybersecurity & Infrastructure Agency (CISA) Elections Infrastructure Government Coordinating Council & Sector Coordinating Council's Joint COVID

registered voters to those over 65 and thus eligible to vote absentee, the Governor's Order mandates that Harris County flout this standard by a mile.

According to Google Maps, a drive from Pflugerville, TX in the Northeast corner of Travis County to Lucky Lake Ranch, in the Southwest corner of Travis County takes 49 minutes one-way assuming there is zero traffic congestion and that the driver pays a toll. Ex. 5 (Google Maps Display). A drive from Lucky Lake Ranch to Travis County's only mail ballot drop-off site takes at least 35 minutes one way by car, assuming there is no traffic. Ex. 6 (Google Maps Display). Regardless, reducing Travis County's sites from four to one will quadruple the demand, and wait times, at the remaining drop-off site.

In Fort Bend County, a drive from Woodcreek Reserve, a neighborhood in Katy, Texas, to Guy, Texas, typically takes 50 minutes one-way, assuming there is no traffic. Ex. 7 (Google Maps Display). A drive from Fresno, TX to Fort Bend's only mail ballot drop-off site in Rosenberg, TX takes, at the very least, 35 minutes one-way, again assuming there is no traffic—an unlikely occurrence between 8 a.m. and 5 p.m. Monday through Friday, the only times the Fort Bend County Elections Administration office is open. Ex. 8 (Google Maps Display).

IV.    **USPS Delays**

On July 30, 2020, the United States Postal Service ("USPS") put Defendant Hughs, each of the State's 254 county clerks, and voters generally, on notice that Texas's absentee ballot application and absentee ballot deadlines risk disenfranchising voters. *See* Ex. 9 (USPS Letter).

> Under our reading of your state's election laws . . . certain state-law requirements and deadlines appear to be the incompatible with the Postal Service's delivery standards and the recommended timeframe noted above.

---

Working           Group,           Ballot           Drop           Box           Paper, https://www.eac.gov/sites/default/files/electionofficials/vbm/Ballot_Drop_Box.pdf.

> There is a significant risk that . . . ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted.
>
> The Postal Service asks that election officials keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election where they choose to vote by mail.

*Id*.

The deadline to request an absentee ballot in Texas is October 23. But, as the USPS has itself stressed, a voter that requests an absentee ballot on the deadline, cannot use USPS to deliver that ballot with any confidence it will be counted. Moreover, undecided voters who wish to weigh all the facts of the election cycle before deciding how to cast their ballot cannot use USPS to deliver their ballots with any confidence that it will be counted.

USPS's letter to the State is on the minds of voters. *See, e.g.*, Ex. 20 (Barreto Report) ¶ 27. Plaintiffs Edelbach and Mason both stated that they are aware of USPS's significant delays in delivering mail and are not confident that if they mail their ballots, they will be delivered in time for them to be counted. Ex. 10 (Edelbach Dec.) ¶ 4; Ex. 11 (Mason Dec.) ¶ 2. Similarly, Joyce Golub, an active member of Plaintiff League of Women Voters of Texas, stated that over the past few months, she has "personally experienced delayed mail delivery" at her home, as well as "mail that simply never arrived." Ex. 12 (Golub Dec.) ¶ 8. Golub expressed that her vote is "much too precious" to risk mailing her ballot through USPS and having it either arrive late or not arrive at all. As a result, she has decided that she "will not mail my ballot under any circumstances." *Id.*

V.      **No Security Interest in Restricting Number of Ballot Drop-off Sites**

The Governor has provided *no explanation* of the alleged security interest in restricting the number of ballot drop-off sites.[11] Indeed, the record shows the opposite. Harris County—which actually was operating multiple absentee ballot return locations before the Governor's order— demonstrates this. Harris County "arranged to apply the same ballot collection and security protocols at each drop-off location, whether at election administration headquarters or elsewhere." Clerk Hollins testified that "[a]ll ballot drop-off locations are equally secure" and that his office "trained enough staff regarding election protocols at each location so that two such trained employees are present at all times while the location is accepting ballots." Ex. 8-1 (Hollins Dec.) ¶ 16. Specifically, Harris County elections officials were trained to "ensure that (1) the voter signs a roster (just as they would when voting in-person), (2) the voter presents valid identification to comply with Section 63.0101 (just as they would when voting in-person), and (3) the voter signs the carrier envelope (just as they would when sending their ballot by mail)." *Id.* Hollins described the mail-in ballot drop-off process as "more secure than the voter using the mail system" because

---

[11] Perhaps to attempt to make up for this deficiency, Texas House Speaker Dennis Bonnen recently claimed that Governor Abbott's October 1 order was made after state leaders received "reports from the field" of people trying to submit multiple mail-in ballots. KXAN, *Lawsuit filed against Gov. Greg Abbott for limiting ballot drop off locations* (Oct. 2, 2020), https://www.kxan.com/news/us-politics/election/lawsuit-filed-against-gov-greg-abbott-for-limiting-ballot-drop-off-locations/ (last visited Oct. 4, 2020). Specifically, Speaker Bonnen claimed that there was a case in Bexar County, where someone attempted to drop off "as many as 40" mail-in ballots. This allegation, however, adds nothing to any security rationale for the Governor's Order. First, Bexar County was not immediately impacted by Governor Abbott's October 1 order because at the time the order went into effect, it was operating only one drop off location. *Id.* Second, the Bexar County Clerk never confirmed this "report," nor did Speaker Bonnen indicate any such ballots were accepted, given that returned ballots require presentation of the voter's ID. *Id.* Third, given the protocols in place at every drop-off location, such a scheme would be identified regardless of *which* drop-off location was used. It would make no sense for a person seeking to fraudulently submit multiple mail-in ballots to use a drop-off location rather than the U.S. mail.

"the ballots are kept in sealed, secured boxes from the moment they leave the voter's hand. *Id.* ¶ 17.

## VI.     Sudden Burdens on Election Officials

Harris County Clerk Hollins has also testified to the significant administrative burden of reducing the number of mail-in ballot drop-off locations from 12 to 1. He "conducted detailed modeling and analysis to determine the likely turnout, methods of voting that voters may choose," and determined "the best allocation of resources to meet voter demand without creating long lines or other circumstances where social distancing would not be possible." *Id.* ¶ 14. Explaining that the ballot drop-off locations had been set since mid-July, Hollins indicates that the Governor's Order is "causing voter confusion." *Id.* ¶ 20. He also warned that the forced reduction "will increase congestion as the volume of ballot returns increases over the next few weeks." *Id.* Finally, Hollins expressed that the Governor's Order "burdens the Clerk's Office administratively," by forcing the county to "change [its] voter education materials, [its] website, and [its] staff training. *Id.* ¶ 25.

## ARGUMENT

To succeed on a motion for a temporary restraining order or for a preliminary injunction, Plaintiffs must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest." *Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005). Plaintiffs make that showing here.

I.     **Plaintiffs Are Likely to Succeed on the Merits of their First and Fourteenth Amendment Claim of Discriminatory, Undue Burdens on the Right to Vote.**

Plaintiff are likely to succeed on the merits of Count 1 of their Complaint, which alleges that the Governor's Order restricting the number of absentee ballot drop-off sites imposes a discriminatory and undue burden on their right to vote in violation of the First and Fourteenth Amendments. When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).[12]

---

[12] Defendants Abbott and Hughs have previously suggested that under Supreme Court precedent, there is no right to vote by mail. For several reasons, this argument has no purchase here. First, this is not a case about whether or which voters have a right to cast their ballot by mail—it is undisputed that the individual Plaintiffs and the Organizational Plaintiffs' affected members unequivocally have such a right under Texas law. *See* Tex. Elec. Code § 82.003. As such, Texas has a constitutional obligation to ensure this right is not abridged in a manner that is either arbitrary or discriminatory. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."). The Governor's October 1 Order fails that test.

Second, Defendants Abbott and Hughs have relied on *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807-09 (1969) for their proposition that vote by mail practices get little to no constitutional scrutiny. In *McDonald*, the Supreme Court rejected a claim by pretrial detainees that the state had denied them equal treatment under the law by denying them access to absentee ballots. *Id.* at 811. The Court applied rational basis review because it found that the right being denied was "not the right to vote . . . but a claimed right to vote absentee," *id.* at 807, and denied the plaintiffs' claim because they had not offered any proof that they had been "absolutely prohibited" from exercising the franchise, *id.* at 809. But *McDonald* is no longer good law. *See Goosby v. Osser*, 409 U.S. 512, 521 (1973) (declining to follow *McDonald* and permitting a claim to proceed based on evidence that alternative means of voting were unavailable); *O'Brien v. Skinner*, 414 U.S. 524, 529, 531 (1974) (again declining to follow *McDonald* and holding that *McDonald* "rested on failure of proof" rather than absence of a right to equal protection); *Am. Party of Tex. v. White*, 415 U.S. 767 (1974) (abandoning *McDonald*'s reasoning and finding that minor party voters had a right to vote absentee in their primary where that right had been extended to major party voters, notwithstanding that minor party voters had the alternative option to vote in-person); *see also Tex.*

When a burden on the right to vote is severe *or* discriminatory, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)) (emphasis added). When a state imposes "reasonable, nondiscriminatory" election regulations, its "important regulatory interests are generally sufficient to justify the restrictions." *Tex. Independent Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). Slight or moderate burdens that fall between the two extremes are subject to a flexible standard that requires the court to make "the 'hard-judgments' common in ordinary litigation," *Voting for Am. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013). "[I]rrespective of whether the burden is classified as 'severe,' 'moderate,' or even 'slight,' 'it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.'" *Richardson v. Tex. Sec'y of State*, No. SA-19-cv-00963-OLG, -- F. Supp. 3d --, 2020 WL 5367216, at \*35 (W.D. Tex. Sept. 8, 2020) (quoting *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009)).

Because the Governor's one-site-per-county rule is discriminatory against voters in Texas's most populous and geographically large counties—counties that on both scores have disproportionately large minority populations—the restriction should be subjected to strict scrutiny. *See Burdick*, 504 U.S. at 434. But even under intermediate or rational basis scrutiny, the evidence shows the State lacks any weighty interests sufficient to justify the burden.

---

*Democratic Party v. Abbott*, 2020 WL 5422917 at \*17 (5th Cir. Sep. 10, 2020) (noting the prior motions panel's failure to wrestle with *Am. Party* in relying on *McDonald*). *American Party* abrogated *McDonald* entirely and Defendants cannot rely on it here.

A.     **The Governor's Order Imposes a Significant and Discriminatory Burden on Voters**

1.     **The Governor's Order Imposes Significant and Unnecessary Burdens on Voters**

Under Texas law, so long as a voter returns their absentee ballot to their local county clerk by no later than (1) before polls close on election day, or (b) not later than 5 pm on the day after the election if the ballot was postmarked before election day, their vote may be counted. *See* Texas Elec. Code § 86.007. Typically, the ballot must be returned either by mail, contract carrier, or in-person if delivered to the early voting clerk's office while polls are open on election day. *Id.* at § 86.006. But Governor Abbott's July 27 Order changed the typical requirements of the Texas Election Code by providing voters with the option to return their absentee ballot in person to their county clerk early, rather than waiting until election day to do so. The Governor implemented this change because "strict compliance with the statutory requirements . . . of the Texas Election Code would prevent, hinder, or delay necessary action in coping with the COVID-19 disaster." Ex. 1 (July 27 Order).

The Governor was right. On July 30, 2020, just three days after his July 27 Order, the USPS sent a letter to Secretary Hughs warning that based on USPS's delivery performance, it would be virtually impossible for some absentee voters to timely return their absentee ballot for counting by mail. *See* Ex. 9 (USPS Letter) at 2 (noting the incompatibility between Texas law, under which a voter may request an absentee ballot up to 11 days before the election and may not be sent the ballot until 7 days later, and USPS delivery standards which require the voter to mail their ballot at least 7 days prior to the counting deadline in order to arrive on time). Combining this reality with the expected upsurge in mail voting, *see, e.g.*, ECF No. 8-1 (Hollins Dec.) ¶ 11, and the need to reduce congesting at polling locations on Election Day given the COVID-19 crisis, additional

12

days on which to return mail ballots by hand are critical to ensuring that absentee voters' ballots are actually counted. *See generally* Ex. 1 (July 27 Order).

But permitting absentee voters to return their ballot early only alleviated one part of their burden. That is because, in a state as large and geographically diverse as Texas, voters in certain counties might still not be able to return their absentee ballot if only permitted to do so to one location. *See* ECF No. 8-1 (Hollins Dec.) ¶ 14 (describing the rigorous study undertaken by Harris County to determine the most efficient way to facilitate voting in November). For some voters, the significant distance between their home and the single absentee ballot return location could act as a significant deterrent to using the in-person delivery option. *See infra* Part I.A.2 (describing the distance voters in Harris County would need to travel in order to return their absentee ballot); *see also, e.g.*, Ex. 10 (Edelbach Dec.) ¶ 7 (noting that it would take him about an hour-and-a-half roundtrip to travel from his home to the NRG Arena). Worse, the congestion and unreasonable wait times that are likely to result from allowing only a single in-person ballot return location at a time when mail voting is skyrocketing can serve as a strong deterrent. *See* ECF No. 8-1 (Hollins Decl.) ¶ 20 ("If we are forced to reduce to one location, I anticipate that toward the end of the early voting and especially on Election Day, we will see massive lines to return ballots in person."); *see also, e.g.*, Ex. 11 (Mason Dec.) ¶ 3–4 (noting that the combination of a long drive to the ballot return location, combined with long wait times once there, raises serious concerns about the risk of exposure to COVID-19 as a result of, for example, having to use public restroom facilities while away from home for such an extended period of time). This is particularly true since the *only people* able to use these locations are precisely those voters at high risk for COVID-19—those

voters over 65 and/or with disabilities—and who will be taking as many precautions as possible to avoid crowded places.

Recognizing the significance of these burdens, some counties, including the populous Harris, Travis, and Fort Bend counties made, implemented, and advertised to voters a plan to make available multiple ballot return locations. *See supra* Factual Background. Such a plan was consistent with the Governor's order. *See* Ex. 2 (SOS Brief) at 5 (noting that "the Secretary of State has advised local officials that the Legislature has permitted ballots to be returned to any early-voting clerk office"). And it was also based on the considered judgment of county clerks who are actually responsible for running Texas's elections. *See, e.g.*, ECF No. 8-1 (Hollins Dec.) ¶¶ 14-17.

The Governor's Order restores the burdens that the county clerks' actions were intended to alleviate. Thus, for voters who, for whatever reason, receive or become ready to return their absentee ballot later in the election cycle but still before the statutory deadline,[13] the only way to

---

[13] It is no defense for Defendants to argue that absentee voters could simply choose to vote sooner, or place their ballot in the postal mail sooner, to ensure that it arrives on time. First, as noted above not all voters will have that option. Under Texas law, voters have a statutory right to request a mail ballot until October 23, 2020. *See* Tex. Elec. Code § 86.0015(b-1). And county clerks are only required to mail the voter a ballot within seven days of processing the application. *Id.* § 86.004. Thus, as the USPS noted in its July 30 letter, some voters—who act consistently with the State's statutory deadlines—simply may not receive their ballot in enough time to timely return it by mail. Second, voters have a First Amendment right to actually consider their vote, and to wait until they feel they have enough information to make a considered choice before returning their ballot. *See, e.g.*, Berg Decl. ¶ 3 (noting the length of the Harris County ballot and his desire to take the necessary time to review his choices and make an informed decision). While that may not require much time for some voters, others may need more time, particularly considering that new information about a candidate is often revealed in the days and weeks before Election Day. For such voters, it cannot be the case that simply because they elected to vote safely by absentee ballot, they also unwittingly submitted to an earlier Election Day and waived their ability to consider all the information (including, for example, the ongoing planned Presidential debates) before casting their ballot.

return their ballot and ensure it is actually counted will be either (1) to hope that USPS will be able to timely deliver their ballot notwithstanding its own insistence that it will not be so able, or (2) to endure a long drive to, a long wait time at, or both a long drive and a long wait time at the single ballot return location in their county. *See supra*. For many voters, either choice—which the Governor's order makes impossible to avoid—imposes a serious burden on their right to vote.

        **2.**        **The Governor's Order Imposes Discriminatory Burdens on Voters.**

The burdens of the Governor's Order do not fall evenly on all voters. Instead, the Order mandates disparate burdens based on where voters live and has predictable disparate impacts on minority communities.

First, the Governor's Order discriminates against people living in Texas's most populous counties by disregarding the extreme variation in demand for access to the drop-off sites among counties.[14] As of January 2020, Harris County had 2.37 million registered voters and 1,012 precincts.[15] Travis had nearly 815,000 registered voters and 247 precincts. *Id.* Fort Bend had over 450,000 registered voters and 159 precincts. *Id.* Other Texas counties have magnitudes fewer registered voters. For example, Loving County has 116 registered voters and 4 precincts,

---

[14] Plaintiffs are mindful that regardless the Governor's order, not all counties intended to open more than one absentee ballot return location. But whether such counties *must* open additional ballot return locations is not a question this Court need grapple with here for two reasons. First, Plaintiffs are not arguing that the Constitution requires any individual county to provide multiple ballot return locations, but simply that where counties have already determined that multiple locations are needed to adequately serve voters, the Governor cannot arbitrarily veto that determination without reasonable justification. Second, the Governor's order entirely forecloses the option to offer multiple ballot return locations, which at least some counties have made clear are necessary to alleviate the serious burdens their voters would otherwise face on their right to vote. There is a serious difference between allowing county election officials to assess the needs of their voters and provide a menu of options to serve those needs—leading to different menus even in different counties of similar size—and imposing a one-size-fits-all policy on counties that bear no reasonable resemblance to one another.

[15] *See* Tex. Sec'y of State, January 2020 Voter Registration Figures, https://www.sos.state.tx.us/elections/historical/jan2020.shtml (last visited Oct. 2, 2020).

Armstrong County has 1,441 registered voters and 9 precincts, Coke County had 2,337 registered voters and 4 precincts, and Upton County had 2,131 registered voters and 6 precincts. *Id.* Texas has 254 counties, most with substantially fewer voters and precincts than the handful of Texas's most populous counties. *Id.* By limiting voters to a single drop-off site regardless of the county's population, the Governor's Order imposes a discriminatory burden on the populous counties' voters. This includes substantially increasing congestion and wait-time for submitting ballots, requiring voters in populous counties to endure significant traffic delays to reach the single drop-off site, and requiring longer public transportation commutes to the single site—with the attendant increased COVID exposure for those seeking to return absentee ballots (by law, limited to those over 65 and with disabilities).

For example, Mr. Hollins has testified that Harris County contains 14% of all the registered voters in Texas, has a population of 4.7 million people, and currently has 2.4 million registered voters. *Id.* ¶ 4. Harris County is also the fourteenth largest county in Texas based on geography, "stretching [ ] nearly 1,800 square miles." *Id.* The reduction from 12 ballot drop-off sites to a single site substantially increases the burden on voters seeking to return their ballots. "Traveling from the County's northwest corner to the current location of the main election office is more than a 100-mile round trip," Mr. Hollins explains. *Id.* Traffic exacerbates that burden. "As an urban county, Harris County often has extreme traffic congestion – even during the pandemic – and traveling across the county to a central location and back can easily take *at least half a day* by car and *all day* by public transportation (if any public transportation is available in the voter's home area)." *Id.* (emphasis added). The problems with the postal service exacerbate the burden the Governor's Order has imposed. "Particularly because of the widely-publicized problems with the U.S. Postal Service, some voters may have trouble receiving their ballot until close to Election

16

Day, and will thus have to return their ballot in person in order to ensure it is returned on time." *Id.* ¶ 20. Mr. Hollins has explained that "[i]f we are forced to reduce to one location, I anticipate that toward the end of the early voting and especially on Election Day, we will see *massive* lines to return ballots in person." *Id.* (emphasis added). Massive lines are precisely the danger that the Governor's July 27 Order and Clerk Hollins' careful planning were designed to prevent. Massive lines—of people over 65 and/or with disabilities—during this epidemic are a recipe for disaster in light of the ongoing pandemic.

Thus, the Governor's Order will impose an impossible burden for some. As Mr. Hollins testified, "voters without reliable transportation will be unable to get to NRG Arena from their homes (which could be more than fifty miles away) in time to have their vote counted." *Id.*; *see id.* ¶ 23 ("The size of the County, and the location of our Houston headquarters, would make it difficult, if not impossible, for some voters to return their ballots to only that single drop-off location. This will undoubtedly force some voters to decide if they will risk their health by voting in person or if they instead will not vote at all. No Texas voters should have to make that decision."); *id.* ¶ 24 ("In my experience, rural voters, and voters without access to transportation have the hardest time traveling significant distances to vote or drop off their ballots."); *see also* Ex. 11 (Mason Dec.) ¶ 3 (expressing concern about long lines and hour-long drive to reach single drop-off site in Travis County); Ex. 10 (Edelbach Dec.) ¶ 6 (testifying that NRG Arena in central Houston is a 36 mile drive from his house).

Second, the Governor's Order discriminates against those living in Texas's geographically largest counties, by preventing the county election officials from spreading the location of drop-off sites throughout the county in a way to reduce travel time. Texas's largest counties by land area are generally located in the southwestern area of the state. For example, Pecos has 4,763 square

miles, Presidio has 3,855 square miles, Val Verde has 3,134 square miles, and Harris is nearly 1,800 square miles.[16] By contrast, Camp County has 196 square miles, Walker County has 784 square miles, Sabine has 491 square miles, and Delta has 256 square miles. *Id.*  As Mr. Hollins explained, a Harris County driver could require half a day to return a ballot to its single location, while a person taking public transportation may require an entire day. ECF No. 8-1 (Hollins Dec.) ¶ 4.

Third, the Governor's Order has a racially discriminatory impact because Texas's most populous counties, and its geographically largest counties, are both disproportionately Black and Latino, while its least populous, and geographically smallest, counties are disproportionately white. Harris is both the most populous Texas county and one of the state's geographically largest, but only 29.54% of its residents are white. Ex. 13 (Tex. Demographic Center Data). Only 33.62% of Fort Bend County's residents are white. By contrast, Texas's geographically smallest and/or least populous counties are disproportionately white. For example, 90.71% of Armstrong County residents are white, 83.72% of Sabine County residents are white, 80.18% of Delta County residents are white, 78.21% of Coke County residents are white, and 75.53% of Loving County residents are white. *Id.*

Even within the most populous counties, there are racial disparities that yield disparate burdens of the Governor's Order by race. For example, in Harris County, white workers make up only 29.54% of the population but only 18.6% of those who rely on public transportation, while Black workers make up 35.7% of those who rely upon public transportation, but only about 20% of the County's population. Ex. 14 (Harris County Public Transportation Data). Minority voters

---

[16] U.S. Census Bureau, QuickFacts Texas, https://www.census.gov/quickfacts/fact/table/TX/ LND110210#LND110210 (last visited Oct. 2, 2020).

within Harris County are thus the most likely to be discriminatorily burdened by the need to potentially spend an entire day, ECF 8-1 (Hollins Dec.) ¶ 4, commuting to the single Harris County ballot drop-off site.

      **B.**    **The Governor's Order Also Worsens Election Officials' Administrative Burdens and Complicates their Effort to Provide a Safe and Secure Ballot Return Process.**

Making matters even worse, the Governor's Order is particularly burdensome because it comes days after absentee voting in Texas *had already begun*, and after counties had already opened, or announced plans to open, multiple satellite ballot drop-off sites. Such late-breaking changes to the rules should not be countenanced, particularly from the State of Texas, which has repeatedly argued before federal courts in the past weeks and months that it is too late to change the rules to accommodate voters' needs. The Governor's Order contributes to voter confusion and imposes unnecessary administrative burdens on the local election officials who must comply with it in the middle of running an election during an unprecedent national crisis. This is something the State has decried in federal court. Ex. 21 (SOS Reply Brief, *Hughs v. Tex. Democratic Party*, *et al.*, No. 20-50683) at 12 (noting the need to provide "certainty" to voters and that voters should be entitled to "rely on announced polling locations and trust that early voting polling places will remain open throughout the early voting period"). The State cannot have it both ways: arguing before federal courts that rules alleviating burdens on voters cannot be implemented because it is too late while issuing gubernatorial edicts with less than 24-hours' notice upending local election officials' carefully calibrated plans. The Governor is not an election official; at this point in the election cycle, this Court should give all due deference to the needs of local election officials to proceed as they had planned.

As Chris Hollins, Harris County Clerk has testified, "[t]his last minute change to election procedures is causing voter confusion." ECF No. 8-1 (Hollins Dec.) ¶ 20; *see also id.* ¶ 25 (noting that county election officials, who have many other election-related tasks to accomplish for the already underway election, are being forced to field calls from voters and other interested constituencies about the impact of the Governor's order). This is so, Mr. Hollins explains, because Harris County's "multiple ballot drop-off locations ha[d] been advertised to voters via social media, media interviews, and other methods." *Id.* ¶ 21. The County's *Harris Votes* website announced the locations, *id.* Ex. F at 2, which were set since mid-July, *id.* ¶ 14. The shifting rules also create the potential for unfounded challenges to voters; for that reason Mr. Hollins explains that "it is **very important** that the legality of methods of returning mail-in ballots be very clear." *Id.* ¶ 6 (emphasis in original). Moreover, in light of the Governor's Order hastily issued on one day's notice, clerks "are having to change our voter education materials, our website, and our staff training." *Id.* ¶ 25. Thus, the Governor's order thus harms the orderly administration of the election.

In recent months, it is *exactly* these types of "precipitous changes to the [election] rules" that the state has successfully argued to the Fifth Circuit "can cause 'confusion' and even undermine public confidence in the outcome of the election itself." *See, e.g.*, State's Opening Br., *Texas Democratic Party v. Abbott*, Case No. 20-50704 (5th Cir. Jun. 29, 2020) (arguing that "precipitous changes to the [election] rules (citing *Purcell v. Gonzales*, 549 U.S. 1 (2006)). Indeed, as the State argued just 2 days before the Governor's Order was issued, "[t]he 2020 election is already underway." *See* Emergency Motion for Stay, *Texas Alliance for Retired Americans v. Hughs*, Case No. 20-40643 (5th Cir. September 28, 2020). Whether or not the State was right in making these arguments, at the very least, it cannot have it both ways: arguing in one court that it

is too late to make changes to the election, and then arguing in this court that it is not. *Cf. Tex. Alliance for Retired Americans v. Hughs*, No. 20-40643, 2020 WL 5816887, at *1 (noting that importance of not "alter[ing] the election rules on the eve of an election"). And the Fifth Circuit's *repeated* recent orders indicating that it is too late to change the election rules should weigh heavily in this Court's analysis of the appropriateness of the Governor's action here. *See id.*; *Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. June 4, 2020) (enjoining election changes one month and ten days before the election); *see also RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (noting voter confusion caused by last minute changes to election rules); *Purcell*, 549 U.S. at 4 (same). After all, the Governor is not an election official. So it is not at all clear why the Governor's interference with election machinery at this late stage of the game should be treated differently than a court order.

### C. The Governor's Order Is Not Justified By Its Purported Interest In Advancing Election Security.

Governor Abbott justifies his Order by asserting a need "to add ballot security protocols" at absentee ballot return locations. Ex. 3 (Oct. 1 Order) at 1. But the Order does not require county officials to actually "add" any additional security measures, and instead only forces them to reduce the number of ballot return locations to one per county. *Id*. Put differently, the actual ballot security protocols required before and after the Governor's order are identical, with the only difference being that now they will only be applied in one location rather than multiple. Such a reduction in voters services does not serve to enhance election security, and may even degrade it instead.

In Harris County, for example—which, before the Governor's order, had set up the most ballot drop off locations of any county in the State—the election security protocols at each of the 12 sites, including the one that now remains in light of the Governor's order, were "the same" and "equally secure." ECF No. 8-1 (Hollins Dec.) ¶ 16. The security measures included having two

trained staff present at the drop off location at all times that it would be open, and having those staff ensure that each voter signed the roster, provided valid identification, and signed the ballot carrier envelope. *Id.* They also included using a "mail ballot tub" to receive the voted absentee ballots, which is a locked ballot box—sealed by tamper-proof seals— that has "a slit large enough for a ballot carrier envelope but small enough that fingers or tools cannot be forced inside the box to tamper with ballots." *Id.* ¶ 17. And they required the mail ballot tub to be returned to the election administration's headquarters each day for processing by a pair of employees. *Id.*

Because the ballot security measures at the single remaining drop off location in Harris County are (and remain) no different than those that were being taken at the 11 other now-closed locations, *id.* ¶ 16, the Order requiring that only one drop off location be used cannot be justified as necessary to "add ballot security protocols."

The Governor's Order actually reduces ballot security. By ordering a reduction down to one ballot return location per county, it is nearly certain that fewer absentee voters will drop their ballots off in person. *See* ECF No, 8-1 (Hollins Dec.) ¶¶ 22, 32. This matters because the use of drop off sites by voters returning mail-in ballots in person "is more secure than returning by mail because (1) there is no danger of tampering or loss of the ballot in transit and (2) voters who return ballots in person must sign a roster and present voter ID." *Id.* ¶ 32; *see also id.* ¶ 22 ("Reducing the drop-off locations from twelve to one will not enhance security of the ballots in any way, as it will force more voters to use USPS rather than see their ballot securely delivered straight to a sealed, secure ballot box."). Thus, to the extent Defendants have a genuine interest in actually *enhancing* election security, they should promote counties setting up multiple convenient drop-off locations and encourage voters to use them. Unfortunately, the Governor's Order takes the opposite approach.

While "[a] State indisputably has a compelling interest in preserving the integrity of its election process," the assertion of such an interest does not require the Court to rubber stamp the State's actions where they do not actually serve such a purported interest. *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989). Rather, the state must "show[] that its regulation . . . is necessary to the integrity of the electoral process." *Id.* Defendants cannot carry their burden. To the contrary, the overwhelming weight of the testimony—provided by local election officials that are actually responsible for running the State's elections—is that the Governor's Order will not enhance ballot security, and perversely, will instead have the overall effect of harming it.

The Court should therefore not countenance the State's unsupported and plainly contrived justification of the Governor's Order as necessary to the election's integrity. Rather, it should find that election integrity in fact requires the Governor's order to be enjoined, and the election conditions returned to their status quo *ante*.

*       *       *

Ultimately, weighing the substantial burden that the Governor's order imposes on voters and election officials *while an election is ongoing* against the cursory justification Governor Abbott has provided for it, it is evident that the Governor may not arbitrarily force counties to restrict voters' ability to return their absentee ballot to a single return location. The status quo *ante* should be restored.

## II.     Plaintiffs Are Likely to Succeed on their Equal Protection Claim.

Plaintiffs are likely to succeed on their Equal Protection claim because the Governor's Order is not "consistent with [the State's] obligation to avoid arbitrary and disparate treatment of the members of its electorate." *Bush v. Gore,* 531 U.S. 98, 105 (2000). It is well-established that

"once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966). And it is likewise well-established that "[t]he right to vote is protected in more than the initial allocation of the franchise [and] Equal protection applies as well to the manner of its exercise." *Bush*, 531 U.S. at 105; *see also Jones v. United States Postal Serv.*, 2020 WL 5627002, at *19 (S.D.N.Y. Sept. 21, 2020) ("[E]ven the nuts and bolts of election administration must comport with equal protection."). Indeed, every "citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see also Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions."); *Bush,* 531 U.S. at 104 (stressing "the equal dignity owed to each voter"). Thus, a State violates the Equal Protection Clause when it fails to meet "the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right." *Id.* at 105.

The Governor's Order not only permits, but *demands*, unequal and arbitrary treatment of Texas voters. By limiting absentee voting drop-off locations to one per county, the Governor has tied the delivery of critical election resources to an arbitrary benchmark. County lines do not—in any way—provide a reasonable measure for the allocation of election resources. Texas has 254 counties ranging in population from 4.7 million people in Harris County to 134 people in Loving County; and ranging in geographic size from Brewster County, over 6,000 square miles and larger than the state of Connecticut, to Rockwall County, under 150 square miles. The election resources needed in Harris or Loving Counties are plainly—and by any reasonable metric—radically different. And yet, the Governor's order *mandates* their equivalence. And the corresponding

burden on voters in populous and geographically large counties is both palpable, *see supra* Part I.A, and impermissible, *see Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Our Constitution leaves no room for classification of people in a way that unnecessarily abridges [the right to vote.]"); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476–78 (6th Cir. 2008) (finding allegations sufficient to establish "burdens on the exercise of that right *depending on where they live* in violation of the Equal Protection Clause"). It is beyond cavil that requiring Harris County and Loving County to have the same number of in-person voting locations would violate the Equal Protection Clause. The same Equal Protection principles apply here.

The Supreme Court has long recognized the arbitrariness of using county lines in allocating electoral representation; and the same principle applies here. In *Gray v. Sanders*, the Supreme Court struck down a county-based electoral procedure for counting votes in the nominating process for statewide offices. 372 U.S. 368 (1963); *see also Bush*, 531 U.S. at 107 (citing *Gray* for the rule against arbitrary and disparate treatment of voters). In so doing, the Court recognized that the equal treatment of *counties* necessarily means the arbitrary and disparate treatment of *voters*. *Id.* at 379 ("Georgia gives every qualified voter one vote in a statewide election; but in counting those votes she employs the county unit system which in end result weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties."). The Court again recognized this principle in *Moore v. Ogilvie,* striking down a signature gathering requirement that used a county unit metric: "This law applies a rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional theme of equality among citizens in the exercise of their political rights." 394 U.S. 814, 818-19 (1969); *see also Bush*, 531 U.S. at 107 (citing *Moore*).

Our elections are governed by the choices of voters, "not trees or acres" or "farms or cities or economic interests." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). In other words, the Supreme Court has long done away with the vestiges of using counties as the appropriate benchmark for providing equality to voters. *See Gray*, 372 U.S. at 380 ("There is no indication in the Constitution that homesite . . . affords a permissible basis for distinguishing between qualified voters within the State."). The Governor's Order is even more troublesome than cases like *Bush*—where a State has merely failed to *prevent* arbitrary and disparate treatment—because the Governor has mandated such arbitrary and disparate treatment with full knowledge of the disconnect between county lines and any reasonable metric of the needs of voters or election administration. He has, in essence, guaranteed certain voters "two, five, or 10 times" or more absentee voting resources than others. *Reynolds*, 377 U.S. at 562. Like in *Moore,* the Governor's Order "discriminates against the residents of the populous counties of the State" and "therefore, lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment." 394 U.S. at 819.

This is not to say that the Equal Protection Clause mandates precise equality in electoral resources across localities. However, statewide electoral rules—like the Governor's Order— cannot create the opportunity for, or in this case *require*, disparate treatment of voters. As the Court in *Bush v. Gore* explained, "[t]he question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." To be sure, they can. Here, "we are presented with a situation where a state [official] with the power to assure uniformity" has not only failed to provide adequate safeguards to voters, as was the case in *Bush*, but has *required* the disparate treatment at issue. 531 U.S. at 109. When a statewide rule is promulgated like the Governor's order, "there must be at least some assurance that the rudimentary

requirements of equal treatment and fundamental fairness are satisfied." *Id.* The Governor's Order
fails that basic test.

## III.  Plaintiffs Will Be Irreparably Harmed if the Governor's Order Is Not Enjoined.

Because the Order violates Plaintiffs' fundamental constitutional rights, they will suffer
irreparable harm absent this Court's intervention. *See, e.g.*, *Deerfield Med. Center v. City of
Deerfield Beach*, 661 F. 2d 328, 338 (5th Cir. Unit B Nov. 1981) (finding that violations of
fundamental rights are always irreparable) (citing *Elrod v. Burns*, 347 U.S. 373 (1976)); *see also
DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. DeLeon v. Abbott*,
791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of
constitutional rights constitutes irreparable harm as a matter of law.") The right to vote, and to
have one's vote counted, is a fundamental constitutional right. *Reynolds v. Sims*, 377 U.S. 533,
562 (1964) ("It has been repeatedly recognized that all qualified voters have a constitutionally
protected right to vote, and to have their votes counted.") (internal citations omitted). As discussed
above, the October 1 Order violates that constitutional right by placing an unconstitutional burden
on voters, including individual Plaintiffs and Organizational Plaintiffs' members, *see, e.g.* Ex. 17
(Chimene Dec.), increasing the risk that their valid, timely cast ballots will not be counted.
Furthermore, it denies voters the equal protection of the law in violation of the Fourteenth
Amendment, by arbitrarily making it more difficult for certain voters to cast a ballot based solely
on where they live within a county, and on which county they live in. This harm is irreparable. *See
Deerfield*, 661 F.2d at 338 (holding that where a fundamental right is "either threatened or in fact
being impaired . . . mandates a finding of irreparable injury.") And, even to the extent that the harm
to plaintiffs is mitigated in some way because they have the option of voting in person or mailing
their ballot—it is not, *see supra*—it is still irreparable. *See id.* (finding that the existence of

alternative means of exercising one's rights "does not eliminate or render harmless the potential continuing constitutional violation of a fundamental right."). Moreover, that alternative may likely be illusory. As Harris County Clerk Hollins testified, the mail delays may cause voters to receive their ballots with insufficient time to return them by mail, forcing voters to attempt to reach the single drop off site or risk their health voting in person. ECF No. 8-1 (Hollins Dec.) ¶ 20.

Finally, the harm is irreparable because the Order's infringement on Plaintiffs' constitutional rights "cannot be undone through monetary relief." *Deerfield*, 661 F.3d at 338; *see also Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) *overruled on other grounds*, -- F.3d --, 2020 WL 5493770 (11th. Cir. 2020) (*en banc*) ("Casting a vote has no monetary value. It is nothing other than the opportunity to participate in the collective decisionmaking of a democratic society and to add one's own perspective to that of his or her fellow citizens. Each vote provides a unique opportunity to do that. No compensation a court can offer could undo that loss.").

## IV.   The Balance of the Equities Weighs in Favor of Plaintiffs.

The Governor's Order violates Plaintiffs' constitutional rights, thus enjoining it will serve the public interest. *See Ingebretsen on behalf of Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where a enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation."); *see also*, *e.g.*, *G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[The . . . cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest."). Furthermore, although the Governor's Order purports to serve an interest in maintaining the integrity of the election and combatting voter fraud, the evidence presented herein rebuts any assertion that the

Order actually serves such a purpose. *See supra* Part I.B. As such, Plaintiffs' have demonstrated that the injury to their constitutional rights outweighs any interest the State may assert, and that the grant of an injunction will not disserve the public interest. *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).  Because the balance of the equities favors Plaintiffs, the Court should grant the injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order or preliminary injunction should be granted.

Dated: October 5, 2020                    Respectfully submitted,

                                          */s Chad Dunn*

Danielle Lang*                            Chad W. Dunn (Tex. Bar No. 24036507)
Mark P. Gaber*                            Brazil & Dunn
Ravi Doshi*                               4407 Bee Caves Road
Molly Danahy*                             Building 1, Suite 111
Caleb Jackson*                            Austin, TX 78746
Campaign Legal Center Action              (512) 717-9822
1101 14th Street NW, Suite 400            chad@brazilanddunn.com
Washington, DC 20005                      K. Scott Brazil (Tex. Bar No. 02934050)
Tel.: (202) 736-2200                      13231 Champion Forest Drive, Suite 406
dlang@campaignlegalcenter.org             Houston, TX 77069
mgaber@campaignlegalcenter.org            (281) 580-6310
                                          scott@brazilanddunn.com
cjackson@campaignlegalcenter.org
rdoshi@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org

*\*Pro Hac Vice* Pending

Luis Roberto Vera, Jr.
LULAC National General Counsel
The Law Offices of Luis Vera Jr., and Associates
1325 Riverview Towers, 111 Soledad
San Antonio, Texas 78205-2260
(210) 225-3300 (office)
(210) 225-2060 (fax)
lrvlaw@sbcglobal.net

29

## CERTIFICATE OF SERVICE

I certify that on October 5, 2020, the foregoing was served on all parties of record registered for CM/ECF notifications, and is also being provided by e-mail to the following counsel for Defendants.


Defendants Abbott and Hughes: Patrick Sweeten (patrick.sweeten@oag.texas.gov)

Defendant Debeauvoir: Sherine Thomas (sherine.thomas@traviscountytx.gov)

Defendant Hollins: Susan Hays (hayslaw@me.com)

Defendant Oldham: Justin Pfeiffer (justin.pfeiffer@fortbendcountytx.gov)


/s/ Chad W. Dunn
Chad W. Dunn