# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

TEXAS LEAGUE OF UNITED LATIN
AMERICAN CITIZENS; NATIONAL
LEAGUE OF UNITED LATIN AMERICAN
CITIZENS; LEAGUE OF WOMEN
VOTERS OF TEXAS; RALPH EDELBACH;
BARBARA MASON; MEXICAN
AMERICAN LEGISLATIVE CAUCUS,
TEXAS HOUSE OF REPRESENTATIVES;
and TEXAS LEGISLATIVE BLACK
CAUCUS;

      Plaintiffs,

v.

GREG ABBOTT, in his official capacity as
Governor of Texas; RUTH HUGHS, in her
official capacity as Texas Secretary of State;
DANA DEBEAUVOIR, in her official capacity
as Travis County Clerk; CHRIS HOLLINS, in
his official capacity as Harris County Clerk;
JOHN W. OLDHAM, in his official capacity as
Fort Bend County Elections Administrator;

      Defendants.

CIVIL ACTION NO. 1:20-cv-01006-RP

## STATE DEFENDANTS' MOTION TO DISMISS

# Table of Contents

Introduction................................................................................................................................1

Background................................................................................................................................2

   I.   The Texas Legislature enacts Section 86.006(a-1), giving voters a limited option of in-person delivery.................................................................................................................................2

   II.   Governor Abbott exercises his emergency powers in the wake of the novel coronavirus. .......2

Argument ..................................................................................................................................4

   I.   Plaintiffs' constitutional claims are barred by sovereign immunity.................................4

     A.   Ex parte Young does not apply to the Governor in this case. ...................................5

     B.   Ex parte Young does not apply to the Secretary of State in this case. ....................6

   II.   No standing exists to bring this suit against the Governor or Secretary of State .......6

     A.   Plaintiffs bear the burden of establishing Article III Standing.................................7

     B.   None of the Organizational Plaintiffs has associational standing..............................7

     C.   None of the Organizational Plaintiffs has organizational standing. .........................9

     D.   The organizational plaintiffs also lack third-party standing....................................11

     E.   The individual plaintiffs' alleged harm does not establish standing.........................12

     F.   Alleged harms are neither traceable nor redressable..............................................14

   III.   Plaintiffs fail to state a claim upon which relief can be granted. ..................................15

     A.   Plaintiffs' Anderson-Burdick claim fails. ...............................................................15

     B.   Plaintiffs' arbitrary disenfranchisement claim fails...............................................19

     C.   Plaintiffs' Section 2 results claim fails. ..................................................................20

       1.   The Proclamation is lawful. ..........................................................................20

       2.   Plaintiffs do not have a private cause of action....................................................23

   IV.   The Court should abstain from ruling on the merits until related state-court litigation is resolved.................................................................................................................................24

Conclusion ..............................................................................................................................26

## Introduction

Never before in any general election in Texas have counties accepted hand-delivered mail-in ballots at more than one location. Texas voters who chose to deliver their ballots themselves, rather than put them in the mail, had to do so at a single location and could do so only on election day.

On July 27, 2020, Governor Abbott vastly expanded voters' ability to hand-deliver their mail-in ballots. He suspended Section 86.006(a-1) of the Texas Election Code to extend the time period for the in-person delivery of marked mail-in ballots—not just on election day, but during the entire period leading up to election day. The Governor amended his prior suspension on October 1, 2020, to make clear that during the added time period for in-person delivery of marked mail ballots, a voter who is delivering a marked mail ballot in person prior to election day must do so at a single early voting clerk's office location, and the early voting clerk's office must allow poll watchers to be present to observe any activity related to the in-person delivery of a marked mail ballot. To be clear, the suspension applies for the time period prior to election day; it leaves Section 86.006(a-1) of the Election Code unchanged on election day. As a result of the suspension, Texas voters do not have to wait until election day to deliver their mail-in ballots. Texas voters now have over *forty days* to deliver their ballots instead of just one.

As part of this expansion of voting opportunities, Governor Abbott has simply put in place the practice of requiring voters to deliver those ballots to a single location within the county with poll watchers present. For the first time during the July 2020 primary runoff elections, a *single* county in Texas allowed voters to deliver ballots in more than one location. Just a small handful of counties in Texas wanted to continue that practice for the 2020 general election. Weighing the expanded opportunity for voters to deliver ballots early with the policy concerns of ballot security and uniformity of the administration of elections across the 254 counties in Texas, Governor Abbott proclaimed that

counties can only accept the early hand-delivery of marked mail-in ballots at one location that serves as the early voting clerk's office—as they had always done in general elections.

## Background

### I. The Texas Legislature enacts Section 86.006(a-1), giving voters a limited option of in-person delivery.

"The history of absentee voting legislation in Texas shows that the Legislature has been both engaged and cautious in allowing voting by mail." *In re State*, 602 S.W.3d 549, 558 (Tex. 2020). To the extent that Texas does permit voters to cast their ballots by mail, the Legislature has instituted a set of commonsense rules designed to ensure ballot security. This includes regulating the manner in which qualified voters may return their mail-in ballot to be counted. Prior to 2015, the Texas Election Code only permitted voters two methods by which to return their ballots: mail and common or contract carrier. That changed with the passage of House Bill 1927, which amended Section 86.006 to give voters a limited option of in-person delivery. Specifically, the provision states, "The voter may deliver a marked ballot in person to the early voting clerk's office only while the polls are open on election day." In making this adjustment, the Legislature intended in-person delivery to be a limited option, available when circumstances make it all but impossible for voters to deliver their ballots on time by means of another method. For this reason, state and local election officials have interpreted the provision narrowly in previous elections. Until this year, no early voting clerk organized multiple mail-in ballot delivery locations—let alone erecting curbside delivery stations in parking lots and parking garages.

### II. Governor Abbott exercises his emergency powers in the wake of the novel coronavirus.

Following the emergence of the novel coronavirus, Governor Greg Abbott utilized his powers under the Texas Disaster Act of 1975, TEX. GOV'T CODE § 418.016, to suspend certain provisions of the Election Code, which he determined would "prevent, hinder, or delay necessary action in coping

with [the] disaster." Pursuant to that power, the Governor issued a proclamation on July 27, 2020, which, among other things, suspended Section 86.006(a-1) so that voters could "deliver a marked mail ballot in person to the early voting clerk's office prior to and including on election day." The proclamation only addressed the length of time in which a voter could hand-deliver his or her marked ballot prior to election day. It did not alter or otherwise affect the other applicable requirements dictated in the statute.

Over the last few weeks, a handful of early voting clerks announced plans to have multiple mail-in ballot delivery locations per county. That practice has no history in Texas before the July 2020 primary runoffs, during which only one county out of 254 allowed multiple delivery locations. It also became apparent that the counties who plan on expanding the number of delivery locations intended to implement inconsistent safeguards to preserve the integrity of the election, such as a lack of poll watchers overseeing ballot deliveries. The Governor therefore issued a second Proclamation on October 1, 2020 ("Proclamation"), to make clear that during the added time period for in-person delivery of marked mail ballots only applies when: (1) voters return their marked ballots at a single early voting clerk's office location that is publicly designated; and (2) the early voting clerk allows poll watchers the opportunity to observe any activity conducted at the early voting clerk's office location related to in-person delivery. In doing so, the Governor advanced the State's weighty interests in clarifying any confusion caused by the July 27 order, reintroducing uniformity in the interpretation and application of the Election Code, and ensuring ballot security.

Plaintiffs contend that the Proclamation violates the First and Fourteenth Amendment as well as Section 2 of the Voting Rights Act. The action only challenges the Proclamation to the extent it conditions the suspension of Section 86.006(a-1) on the early voting clerk organizing a single delivery location for marked mail ballots. The action does not challenge the requirement that the early voting

clerk permit poll watchers to observe any activity conducted at the early voting clerk's office that relates to the in-person delivery of a mail-in ballot.

## Argument

### I.     Plaintiffs' constitutional claims are barred by sovereign immunity.

"[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). Because neither the Governor nor the Secretary enforces or implements the challenged Proclamation, that exception does not apply here.

*Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). It necessarily follows that for this exception to apply, the state official must have committed, or demonstrated a willingness to commit, some type of affirmative action contrary to federal law that the court can order the state official to cease performing. *See Ex parte Young*, 209 U.S. 123, 157 (1908); *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (a proper defendant has both "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty").

In other words, *Ex parte Young* allows suits for injunctive or declaratory relief against state officials, provided the state officials have sufficient "connection" to enforcing the allegedly unconstitutional action. *City of Austin*, 943 F.3d at 997. Otherwise, the suit is effectively against the state itself and barred by sovereign immunity. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). Should "a state actor or agency [be] statutorily tasked with enforcing the challenged law

and a different official is the named defendant," then the requisite connection is absent and "[the court's] *Young* analysis ends." *City of Austin*, 943 F.3d at 998.

   A.   ***Ex parte Young*** **does not apply to the Governor in this case.**

Under the above framework, Plaintiffs' constitutional claims against the Governor are precluded by sovereign immunity.[1] Although the Governor issued the October 1 Proclamation by means of his emergency powers, the statutory authority on which the Proclamation was based does not grant the Governor a corresponding duty to enforce the contents of his order. *See* TEX. GOV'T. CODE §§ 418.012, 418.016, 418.018(c). That duty instead falls to local law enforcement and, on special occasion, the Attorney General. *Id.* at § 418.173; TEX. ELEC. CODE §§ 31.006, 273.001. The Governor, as a consequence, lacks the necessary "connection" for the *Ex parte Young* exception to apply.

The Fifth Circuit addressed this very issue in *In re Abbott*, 956 F.3d 696 (5th Cir. 2020). There, the court held that plaintiffs could not challenge a pandemic-related executive order by suing the Governor. "The power to promulgate law is not the power to enforce it." *Id.* at 709. And thus a statute that empowers the Governor to "issue," "amend," or "rescind" executive orders cannot be read as the necessary "connection" to trigger the *Ex parte Young* exception. *Id.* This Court has already considered the scope of *In re Abbott's* ruling and agreed that though the Governor promulgated the emergency order, he could not enforce it such as to implicate *Ex parte Young*. *6th St. Bus. Partners LLC v. Abbott*, 1:20-CV-706-RP, 2020 WL 4274589, at *5 (W.D. Tex. July 24, 2020)."By this reasoning, Plaintiffs may not rely on the *Ex parte Young* exception to obtain injunctive relief against [the Governor] in this case either." *Id.*

---

[1] *OCA-Greater Houston v. Texas* held, without analysis, that the Voting Rights Act abrogates sovereign immunity. *See* 867 F.3d 604, 614 (5th Cir. 2017). That holding does not apply to Plaintiffs' other claims because Section 1983 does not abrogate sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 341 (1979). Also, the Secretary preserves the argument that *OCA-Greater Houston* was wrong. "Congress did not unequivocally abrogate state sovereign immunity under Section 2 of the Voting Rights Act." *Ala. State Conference of NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (Branch, J., dissenting). Nor could it have. *See id.* at 656 & n.2.

**B.** *Ex parte Young* **does not apply to the Secretary of State in this case.**

The Secretary likewise does not enforce the Proclamation. *See* TEX. GOV'T CODE § 418.173. Nor does she implement or enforce the Election Code provision that is the subject of the challenged provision. *See* TEX. ELEC. CODE § 86.006(a-1). That is instead the province of local law enforcement and the early voting clerk respectively. *See Id.* at § 83.001 (charging the early voting clerk with conducting early voting in each election); *see also* ECF 8-1 ¶ 3. Indeed, the failure to comply with an executive order issued pursuant to §§ 418.012 and 418.016 constitutes a separate criminal offense with a specified penalty. TEX. GOV'T CODE § 418.173. It is therefore enforced through criminal prosecution and falls entirely outside of the Secretary's delegated authority.

Additionally, even where a state official "has the authority to enforce" a law, a plaintiff must further allege that the state official "is likely to" enforce the law in a way that would "constrain" the plaintiff. *City of Austin*, 943 F.3d at 1001–02. A state official must have not only "the particular duty to enforce the statute in question" but also "a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). Here, Plaintiffs have not plausibly alleged that the Secretary "is likely to" enforce the Proclamation. For one thing, the Secretary does not believe that she has that authority and so is unlikely to make such an effort. For another, according to Plaintiffs' own Complaint, the Secretary previously advised local election officials that mail-in ballots could be returned to any early-voting clerk office, which is what Plaintiffs want. *See* ECF 16 ¶ 48. Plaintiffs thus cannot "point[] to specific enforcement actions of" the Secretary that "warrant[s] the application of the *Young* exception." *City of Austin*, 943 F.3d at 1001.

## II.    No standing exists to bring this suit against the Governor or Secretary of State.

Neither the organizational plaintiffs nor the individual plaintiffs have alleged sufficient facts to demonstrate standing.

## A.    Plaintiffs bear the burden of establishing Article III Standing.

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Courts persistently inquire into standing because "[w]ithout jurisdiction the court cannot proceed *at all* in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quotation omitted) (emphasis added). At the pleading stage, the individual plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (quotation omitted). Specifically, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The organizational plaintiffs have two avenues to allege standing: (1) associational or (2) organizational. *See NAACP v. City of Kyle*, 626 F.3d 233, 237–38 (5th Cir. 2010). Organizational standing requires that the plaintiff establish injury, causation, and redressability. *Id.* For associational standing, the organization must show (1) that its members would independently have standing; (2) that the interests the organization is protecting are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).

Because Plaintiffs are "invoking federal jurisdiction," they "bear[] the burden of establishing these elements" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

## B.    None of the Organizational Plaintiffs has associational standing.

None of the Organizational Plaintiffs pleads facts establishing associational standing. A plaintiff cannot have associational standing unless one of its members independently satisfies the Article III standing requirements. *Ctr. for Biological Diversity*, 937 F.3d at 536. For this to occur, the plaintiff must establish two threshold facts. First, the plaintiff must establish that it has "members"

within the meaning of the associational standing test articulated in *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership"). Second, the plaintiff must identify specific members who have "suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Plaintiffs fail both tests. Although Organizational Plaintiffs describe themselves as having members in the colloquial sense, none assert facts establishing that its members "participate in and guide the organization's efforts," as is required for associational standing. *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994); *see also Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014) (explaining that "'indicia of membership' consists of elect[ing] leadership, serv[ing] as the organization's leadership, and financ[ing] the organization's activities, including the case's litigation costs").

Even if they had established that they have members, Plaintiffs would still need to identify injured members. The Supreme Court has unequivocally held that the "requirement of naming the affected members has never been dispensed with" except "where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498–99. Here, Organizational Plaintiffs implicitly acknowledge that only a fraction of their membership qualifies to vote by mail and that only some of those members intend to deposit their ballot at a delivery location. *See*, *e.g.*, ECF 16 ¶¶ 12, 14. Hence, this is not a situation where Organizational Plaintiffs can evade their obligation to identify specific members by pointing to a blanket harm. *See Summers*, 555 U.S. at 498 (holding that courts do not "engage in an assessment of statistical probabilities" when evaluating standing)

Despite this requirement, none of the Organizational Plaintiffs identify a specific member who has suffered a requisite injury in-fact on account of the Governor's Proclamation. To be sure, both the Mexican American Legislative Caucus (MALC) and the Texas Legislative Black Caucus (TLBC)

assert that "at least one member intends to drop off their voted mail ballot at a mail ballot drop-off location that is not the early voting clerk office," but neither Plaintiff names or identifies that member. *See Summers*, 555 U.S. at 498–99. The only individuals identified in the Complaint are Ralph Edelbach and Barbara Mason, but the Complaint does not allege that they are members of Organizational Plaintiffs. The Complaint in fact distinguishes between Plaintiffs Edelbach and Mason on one hand and the Organizational Plaintiffs' members on the other. *See, e.g.*, ECF 16 ¶ 52 ("voters like Plaintiffs Edelbach and Mason, as well as many Texas LULAC and LWVTX members"). Moreover, even if Plaintiffs Edelbach and Mason were members, they could not support associational standing because they lack individual standing for the reasons explained below.

Thus, regardless of whether Organizational Plaintiffs have members, as defined in *Hunt*, Plaintiffs could not acquire standing through them and their claims should be dismissed. *See City of Kyle*, 626 F.3d at 237 (requiring evidence of "a specific member"); *see also Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) ("[T]he complaint did not identify any member of the group" and "where standing is at issue, heightened specificity is obligatory at the pleading stage); *N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011) (The plaintiffs lacked standing because the only member identified in the compliant did not suffer an injury in-fact.); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) ("[A]dvocacy is only appropriately—and constitutionally—undertaken on behalf of another when that other has suffered an injury.").

### C.    None of the Organizational Plaintiffs has organizational standing.

Organizational Plaintiffs do not have organizational standing because they have not plausibly alleged that they, as organizations, will suffer injuries in-fact. The League of Women Voters of Texas (LWVTX) does not expressly claim to have suffered an injury in its own right. *See* ECF 16 ¶ 16–17. It therefore does not appear to claim organizational standing. Plaintiffs MALC and TLBC, likewise, only

claim that their "members . . . expended or were in the process of devoting resources to educate voters." ECF 16 ¶¶ 19, 21. They do not assert that they, themselves, diverted resources on account of the Proclamation. Accordingly, they too do not expressly claim to have suffered an injury in their own right or appear to rely on organizational standing.

The only Organizational Plaintiff to assert explicitly that it suffered an injury outright is the League of United Latin American Citizens. It contends that the Proclamation will force the organization to "divert resources away" from ongoing mobilization efforts. ECF 16 ¶ 15. Though the diversion of resources can constitute a requisite injury under certain circumstances, "[n]ot every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. "The change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

In this case, Plaintiff LULAC's alleged diversion of resources relates to "educating voters about the impact of the Governor's order." ECF 16 ¶ 15. However, spending resources to teach third parties about the law, on its own, is not an injury in-fact. *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (holding that a "self-serving observation that [plaintiff] has expended resources to educate its members" about the challenged law does not present an injury in fact). The expenditures to educate members and the organization's communities must cause the organization to incur "'operational costs beyond those normally expended' to carry out its advocacy mission." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434). Plaintiff LULAC makes no such allegation.

In addition, to establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities." *Def. Distributed v. U.S. Dep't of State*, 1:15-CV-372-RP, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). And it must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Id.* (quoting *City of Kyle*, 626 F.3d at 238). Plaintiff LULAC does neither. It has "only conjectured that the resources" it diverted "could have been spent on other unspecified [LULAC] activities." *City of Kyle*, 626 F.3d at 239. That, however, is not enough. *See Def. Distributed*, 2018 WL 3614221, at *4 (ruling that projects must be described with "sufficient specificity to constitute an injury in fact").

### D.    The organizational plaintiffs also lack third-party standing.

Even if Organizational Plaintiffs had Article III standing, they would lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 n.3–4 (2014). Section 1983 provides a cause of action only when the plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a third party's rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates, but without exceptions, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" to bring a § 1983 claim because a plaintiff

"generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Here, the Organizational Plaintiffs premise their claims on the right to vote. But Organizational Plaintiffs are artificial entities that do not have voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002). The Organizational Plaintiffs therefore are necessarily asserting the rights of third parties and cannot sue under § 1983.

Moreover, because this follows from the statute itself, Plaintiffs cannot invoke any prudential exceptions. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because Congress specified in the statute who may sue, prudential standing principles do not apply."); *see also* Currie, 1981 Sup. Ct. Rev. at 45. But even if Organizational Plaintiffs could invoke prudential-standing exceptions, their Complaint does not do so. Plaintiffs do not allege that they have "a 'close' relationship with" voters, and there is no reason to think voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting the Supreme Court has generally "not looked favorably upon third-party standing").

### E. The individual plaintiffs' alleged harm does not establish standing.

Neither Individual Plaintiff has identified a cognizable injury. Their claims instead rest on speculation about what impact external events, such as COVID-19, may have on the speed with which they receive and return their mail-in ballot. Indeed, the very language Individual Plaintiffs use to describe their alleged injury reinforces the fact that any asserted harm is "conjectural or hypothetical" and not "actual or imminent." *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) (citing *Lujan*, 504 U.S. at 560); *see also Clapper*, 568 U.S. at 401 (distinguishing between a certainly impending injury and one built on subjective fear). Plaintiff Edelbach, for example, has "concerns" about "whether the Postal Service will be able to timely and safely transmit his absentee ballot for counting." ECF 16 ¶ 22.

Plaintiff Mason, likewise, is "worried" and "concerned that she will not have enough time to receive, consider, vote, and timely return her ballot by mail" unless she has the option of delivering the ballot to a delivery location. ECF 16 ¶ 23.

"Subjective fear," however, "does not give rise to standing." *Clapper*, 568 U.S. at 418. Plaintiffs seek prospective relief in their Complaint. Accordingly, they must establish an "imminent" future injury to satisfy standing. *Lujan*, 504 U.S. at 564. The Supreme Court has repeatedly interpreted this to mean that a "threatened injury must be *certainly impending* to constitute injury in fact"— "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted). The rejection of a mail-in ballot as late is very rare. According the U.S. Election Assistance Commission, only 1.76 percent of mail-in ballots in 2018 general election were rejected statewide.[2] Of that 1.76 percent, only a fraction was rejected because the ballot was received after the deadline. A less than 1% probability of injury is not "*certainly impending*." *Clapper*, 568 U.S. at 409.

Nor have Individual Plaintiffs pled facts establishing that their particular mail-in ballot will be rejected as late or is even more likely to be rejected as late than the typical mail-in ballot. They instead rely on the general proposition that the Postal Service has experienced "mail delivery problems." ECF 16 ¶¶ 23, 63. "[G]eneral data [] does not establish a substantial risk that Plaintiffs themselves will [be injured]; Plaintiff-specific evidence is needed." *Stringer v. Whtiley*, 942 F.3d 715, 722 (5th Cir. 2019). Hence, even if other voters in different jurisdictions were able to establish a likelihood of delay, *see* ECF 16 ¶ 63 (noting the existence of litigation concerning the Postal Service), that has no bearing on whether Individual Plaintiffs have standing. Allegations of "an imminent injury" must be "[p]laintiff-specific." *Stringer*, 942 F.3d at 722. "[F]uture injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves." *Id.* at 721.

---

[2] U.S. Election Assistance Commission, Election Administration and Voting Survey: 2018 Comprehensive Report at 14, https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

**F.      The alleged harms are neither traceable nor redressable.**

Plaintiffs also lack standing to sue for the additional reason that the Governor and Secretary's actions do not cause Plaintiffs' alleged injuries; nor will an injunction against them prevent the Proclamation's enforcement. In the course of their Complaint, Plaintiffs do not point to a single action taken (or that could be taken) by the Secretary that has resulted in Texas Counties reducing the number of delivery locations to one. Their only assertion is that the Secretary is "the chief election officer of the state." ECF 16 ¶ 25. However, designation aside, "the Secretary does not conduct elections. Rather, the state's 3,000 or so political subdivisions run general and special elections, while the political parties conduct primary elections." *Lightbourn v. Cty. of El Paso*, 118 F.3d. 421, 428 n.7 (5th Cir. 1997). As a result, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (quotation and alterations omitted). They are "the result of the independent action of some third party not before the court." *Id.* (quotation and alterations omitted).

Furthermore, as explained above in Section I, neither the Governor nor the Secretary of State have authority to enforce the requirements of the Governor's executive order should local election authorities violate it. For that reason, the Governor and the Secretary do not cause—and any relief ordered against them would not redress—the Plaintiffs' asserted injuries. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) ("The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."). Plaintiffs' Complaint, in short, "confuses [a] *statute*'s immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants*." *Id.* at 426; *see also 6th St. Bus. Partners LLC*, 2020 WL 4274589, at *3 (holding that injuries stemming from an executive order were not traceable to the Governor because he lacked the ability to enforce). In the interest of brevity, the Secretary asserts that this Court's analysis under *Ex parte Young* also bears on the standing analysis. *See City of Austin*, 943 F.3d at 1003.

**III.    Plaintiffs fail to state a claim upon which relief can be granted.**

Even assuming Plaintiffs could overcome these jurisdictional flaws, their case must be dismissed nonetheless because they fail to plead facts plausibly alleging any violation of their constitutional or statutory rights.

**A.    Plaintiffs' Anderson-Burdick claim fails.**

By alleging that the Proclamation violates the right to vote, Plaintiffs effectively argue that requiring counties to follow their prior practice—one delivery location per county—imposes an undue burden. That argument fails for two independent reasons: (1) the Proclamation does not encroach on the right to vote whatsoever; and (2) the Proclamation survives any *Anderson-Burdick* review because any burden is miniscule.

The Constitution does not include a freestanding right to vote in whatever manner Plaintiffs deem most convenient. When considering a challenge to the limited availability of absentee ballots, the Supreme Court distinguished "the right to vote" from the "claimed right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). It concluded that the plaintiffs' inability to vote by mail did not implicate the right to vote because it did not "preclude[] [the plaintiffs] from voting" via other methods. *Id.* at 808. That holding dooms Plaintiffs' *Anderson-Burdick* claim. *See also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.").

The State of Texas has gone out of its way to provide its citizens with an abundance of opportunities to cast their ballot. Voting by mail is but one. Texas has scheduled the early voting period to commence on October 13, 2020, and continue through the fourth day before election day.

*See* Proclamation of the Governor, July 27, 2020.[3] This will furnish voters 19 days in which to cast an in-person ballot, including election day. Voters may cast their ballot in-person (including by curbside, if eligible) at any polling location in their home county during the early voting period (and often on election day).[4] Many voters will have the option of a hundred or more polling locations from which to choose,[5] each one of which will be open a minimum of eight hours each day. *See* Tex. Elec. Code § 85.064.

In addition, Texas provides multiple options by which qualified voters may return their mail-in ballots, including by mail, by common or contract carrier, and by in-person delivery. TEX. ELEC. CODE 86.006(a). Because the challenged Proclamation does not affect Plaintiffs' numerous other options for voting, it does not affect the "right to vote," only the "claimed right" to have multiple options for in-person delivery of a mail-in ballot. *McDonald*, 394 U.S. at 807.

Moreover, the Governor's Proclamations made voting easier, not harder. Plaintiffs cannot claim that in-person delivery of mail-in ballots during the early voting period (an option that did not exist before the Governor allowed it by Proclamation) is impermissibly infringed by the Governor's Proclamation clarifying its scope. Plaintiffs attempt to create a pernicious one-way ratchet in which every emergency suspension of law creates a new "right to vote" that cannot be scaled back in light of new circumstances. That would impose significant burdens on Texas's ability to respond to the pandemic, and it is not required by *Anderson-Burdick*.

However, even if this Court concludes that the right to vote is implicated, the Proclamation easily passes muster under *Anderson-Burdick*, as any burden is *de minimis*, and the statute advances

---

[3] The period for early voting by personal appearance during the November election would have begun on October 19, *see* TEX. ELEC. CODE § 85.001; however, Governor Abbott extended it in response to COVID-19 by means of an emergency proclamation.
[4] A list of all counties participating in the Countywide Polling Place Program can be found at the Secretary of State's websites, https://www.sos.state.tx.us/elections/laws/countywide-polling-place-program.shtml.
[5] Harris County, for example, has announced that it will host 120 early voting polling locations and 767 election day polling locations for the November general election, with the possibility of adding more between now and the start of the in-person voting period.

weighty State interests. To apply the *Anderson-Burdick* test, a court must "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Then, the Court "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 388 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). When a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

Addressing each element in turn, the Governor's actions expanded Plaintiffs' ability to deliver a marked mail ballot in person. He did not curtail or burden it. Prior to his July 27 and October 1 proclamations, voters could deliver their ballots in-person only on election day. TEX. ELEC. CODE § 86.006(a-1). The Governor suspended that limitation, permitting voters to deliver their ballot to the early voting clerk as soon as their ballots were marked and ready. Significantly, the Proclamation did not eliminate any practice previously available to voters on election day.. The Election Code only introduced in-person delivery as an option in 2015, and the State is aware of no county or political subdivision offering more than one delivery location before this year.

Nor is there any reason to suspect that voters will be unable to return their ballots by the deadline on account of the Proclamation. In addition to having a robust in-person voting period, Texas has taken care to ensure that voters who vote by mail have sufficient time to cast their ballot. The Election Code permits voters to submit their application for a ballot by mail as early as January 1 of the calendar year in which the election will be held. For voters who qualify by reason of age or disability, the State offers voters the option to submit an annual application, meaning that voters will

receive a ballot for every relevant election held that year. If voters submit their application in a timely fashion, the Election Code requires the early voting clerk to distribute ballots to voters no less than 30 days before election day. Even assuming *arguendo* that complications from COVID-19 could cause intermittent delays, nothing in the Complaint suggests that a month is insufficient time for Plaintiffs to review, mark, and then return their ballots.

Moving on to the next *Anderson-Burdick* prong, the State's interests more than justify the supposed burden placed on voters. Election fraud, specifically vote-by-mail election fraud, has proven to be a frequent and enduring problem in Texas. *See Crawford.*, 553 U.S. at 195 n.12 (plurality) (noting that most of the documented cases of voter fraud were related to absentee voting); *Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (en banc) (noting that mail-in voting is "far more vulnerable to fraud, particularly among the elderly."). In the last Legislative Session alone, the Texas Legislature heard testimony from district attorneys and law enforcement about coordinated efforts to steal and harvest votes. Tex. S. State Affairs Comm. Hearing, 86th Leg., R.S. (Mar. 18, 2019). Limiting the number of in-person delivery locations reduces the risk of these criminal act succeeding. *Crawford*, 553 U.S. at 196 (plurality) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). It enables election personnel to focus their resources and attention on a single location, and it prevents fraudsters from forum shopping should one delivery location have fewer safeguards or its personnel exhibit less prudence.

In addition, because the historical practice has been to limit the number of early voting clerk's offices to a single location per county, there is little uniformity among early voting clerks in interpreting and implementing Section 86.006(a-1). This discrepancy has two chief consequences. First, procedures will vary between counties and even between delivery locations within a single county including precautions that must be taken to ensure the delivery process is both accessible and resistant to fraud. Second, the impromptu and haphazard implementation of additional delivery locations could result in

disparate treatment among Texas voters since not every county has interpreted Section 86.006(a-1) the same way. The State therefore has an acute interest in clarifying the law, and establishing uniformity in the manner in which counties administer the election.

## B. Plaintiffs' arbitrary disenfranchisement claim fails.

Plaintiffs contend that the Proclamation violates the Equal Protection Clause, but this claim also fails as a matter of law. To start with, Plaintiffs' reliance on *Bush v. Gore* is misplaced. 531 U.S. 98, 104–05 (2000). The opinion in *Bush v. Gore* was "limited to the present circumstances" because "the problem of equal protection in election processes generally presents many complexities." *Id.* at 109. And as such the opinion has limited precedential value. *See League of United Latin Am. Citizens v. Abbott*, 951 F.3d 311, 317 (5th Cir. 2020) (doubting that *Bush v. Gore* could apply outside of those specific facts considering the Court's "express pronouncement").

The case is also readily distinguishable from the current controversy, as is the other case Plaintiffs cite, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966). In *Bush v. Gore*, the Court confronted a unique situation, where the "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." 531 U.S. at 106. Here, in contrast, the Proclamation reestablishes a single universal rule that is easily administrable and applies statewide. The Proclamation in fact was issued in part to advance uniformity by requiring each county to have a single location serving as the early voting clerk's office.

In *Harper*, meanwhile, the Court overturned a direct poll tax, which invidiously discriminated between voters. 383 U.S. at 668. Here, however, the argument is that the State has not gone far enough in removing incidental barriers to voting, not that the State imposed an additional qualification that invidiously denies voters the franchise. At most, Plaintiffs claim that the Proclamation will have a disparate impact on voters based on their geography. ECF 16 at ¶ 75. But that triggers no more than

rational-basis review, which the Proclamation more than satisfies. *See, e.g.*, *Phillips v. Snyder*, 836 F.3d 707, 719 (6th Cir. 2016); *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007).

The fact that the Proclamation would survive rational basis review leads to the final reason why Plaintiff's claim fails as a matter of law. Namely, an action taken by the government cannot arbitrarily disenfranchise voters when it advances legitimate government interests. As explained above, the Governor had good reasons for suspending Section 86.001(a-1), such as expanding the opportunities for eligible voters to return a marked mail ballot in person prior to election day, but doing so in a manner that still provided for ballot security. Plaintiffs may disagree with these reasons, but the Proclamation is reasonable in light of the State's interests in preserving uniformity and integrity in its elections.

### C. Plaintiffs' Section 2 results claim fails.

Plaintiffs' Section 2 "results test" claim fails as a matter of law. *See* ECF 16 ¶¶ 79–82. They have not plausibly alleged a violation as to *any* Texas voters, and they certainly have not "establish[ed] that no set of circumstances exists under which [the Proclamation] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

### 1. The Proclamation is lawful.

The Proclamation does not violate Section 2. Plaintiffs Section 2 claims are governed by the two-part framework established in *Veasey*, 830 F.3d at 244. Accordingly, Plaintiffs must plausibly plead that:

> (1) [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, [and]
>
> (2) [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Id.* (alterations in original). Plaintiffs cannot satisfy either of these two requirements.

First, Plaintiffs' Section 2 claim fails because they have not plausibly alleged that allowing only one delivery location is a "discriminatory burden," much less one that affords Latino voters "less opportunity than other members of the electorate to participate" in the election. *Veasey*, 830 F.3d at 244. The Proclamation only affects voters who meet the eligibility requirements to vote-by-mail. Plaintiffs make no assertion in their Complaint that this population of voters are predominately or disproportionately made up of individuals who identify as Latino, such that they would be disparately affected.

This failure to allege that most voters who utilize mail-in voting are Latino precludes a finding of disparate impact. In *Personnel Administrator of Massachusetts v. Feeney*, the plaintiffs challenged a hiring preference given to veterans as discriminatory against women. 442 U.S. 256 (1979). The Supreme Court rejected that claim because even though "few women benefit from the preference," the group disadvantaged "is not substantially all female." *Id.* at 275. The fact that "significant numbers of nonveterans are men, and all nonveterans—male as well as female—are placed at a disadvantage" precludes "the inference that the statute is but a pretext for preferring men over women." *Id.* The same logic applies here. *See Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1291 (7th Cir. 1977) (refusing to find disparate impact because "the class disadvantaged . . . was not predominantly nonwhite").

In addition, Plaintiffs have not asserted that Latinos would have greater difficulty accessing a central location for the delivery of mail ballots or, in the alternative, submitting their ballots on time should they rely on the Postal Service or a common or contract carrier. Plaintiffs have not, for example, alleged that Latino voters live further away from the early voting clerk's office than non-minority voters. They have not alleged it takes the Postal Service more time to deliver items from Latino residences. They have not alleged that Latino voters face longer or more frequent delays when sending an item by mail.

At most, Plaintiffs contend that many of the state's largest counties by population or land area have significant Latino populations. ECF 16 at ¶¶ 55–59. But with the exception of Harris, Travis, and Fort Bend Counties, Plaintiffs do not allege that these counties had or planned on having more than one delivery location prior to issuance of the Proclamation. ECF 16 at ¶¶ 41–43. Rather, Plaintiffs allegations are limited to asserting that only three of the 254 counties in Texas intended to organize, for the first time, multiple mail-in ballot, delivery locations.

If anything, the facts presented in the Complaint demonstrate that the rule articulated in the Proclamation imposes an identical burden on all voters, to the extent it burdens voters at all, as each voter must go to the same location to deliver his or her ballot. Moreover, with respect to the ongoing COVID-19 pandemic, any voter who chooses to return their ballot by personal delivery will invite at least some personal interaction. The risk of exposure is the same regardless of whether the voter is Black, Latino, or a member of any other demographic group.

Second, Plaintiffs' Section 2 claim fails because they do not allege any plausible causal link between the alleged "burden on voting rights" and "social and historical conditions that have produced discrimination against minorities currently, in the past, or both." *Veasey*, 830 F.3d at 245. To be sure, Plaintiffs claim that Latino voters are more susceptible to the dangers of COVID-19. However, Plaintiffs do not allege *any* facts showing that this susceptibility is "directly tied to social and historical conditions stemming from discrimination." ECF 16 ¶ 79.

For example, Plaintiffs have not stated the extent to which Latino voters "bear the effects of discrimination in such areas as education, employment and health which hinder their ability to" not only participate effectively in the political process but also adapt to the virus. *Thornburg v. Gingles*, 478 U.S. 30, 37 (1986). Plaintiffs have not stated "whether there is a significant lack of responsiveness on the part of elected officials" that has facilitated poor health outcomes among Latino voters when exposed to the virus. *Id.*

Their allegations, in short, are mere "[t]hreadbare recitals of the elements of a cause of action's elements, supported by mere conclusory statements" that the United States Supreme Court rejected in *Ashcroft v. Iqbal.* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And in any event, Plaintiffs' allegations of *disparities* in COVID-19 fatalities are not allegations of *discrimination* in voting. *See* ECF 16 ¶ 31. Plaintiffs allege no facts connecting the two.

### 2. Plaintiffs do not have a private cause of action.

Plaintiffs' Section 2 claim fails for an additional, independent reason: The Voting Rights Act does not provide them with a private cause of action. The Supreme Court has often "[a]ssum[ed], for present purposes, that there exists a private right of action to enforce" Section 2. *City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality); *see also Morse v. Republican Party of Va.*, 517 U.S. 186, 288 n.21 (1996) (Thomas, J., dissenting) (noting the Court has "inadvertently, and perhaps incorrectly, allowed private suits to proceed under" Section 2). Multiple opinions have suggested, in dicta, that private plaintiffs can enforce Section 2, but the claims implicated a denial or abridgment of an individual's right to vote. *See Morse*, 517 U.S. at 232–33 (1996) (opinion of Stevens, J.) (quoting legislative history and discussing "a right to vote"); *id.* at 240 (Breyer, J., concurring in the judgment) (similar). That implied cause of action, if it exists, does not extend to Plaintiffs.[6]

Plaintiffs restrict their Section 2 claims to "LULAC Plaintiffs and minority voters." ECF 16 ¶ 81. But they do not identify any individual registered voters whose right to vote is denied or abridged under Section 2, and they cannot rely on the rights of third-party voters. *See supra* Part II.D. An implied cause of action is available only to "the particular plaintiff" in whom "the statute creates 'rights . . .'"

---

[6] Moreover, *Morse*'s reasoning is inconsistent with the later majority opinion in *Sandoval*, which limited its "search for Congress's intent [to] the text and structure of" the statute. *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001). "[D]ecisions before *Sandoval* frequently implied private rights of action without rigorous analysis; they did so by making a somewhat cursory inspection of the statute and its legislative history." *Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310, 311 (5th Cir. 2017) (affirming "[e]ssentially for the reasons stated in the district court's comprehensive and well-reasoned opinion"). Such pre-*Sandoval* opinions are "are not binding nor persuasive." *Id.* (declining to follow a pre-*Sandoval* Fifth Circuit opinion). Under the Supreme Court's current approach, Section 2 does not create any private cause of action.

*Delancey v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)). In the case of Section 2, the "particular plaintiff" is a voter who because of his or her membership in a protected class, has less opportunity to participate in the political process. 52 U.S.C. § 10301(b). Because Plaintiffs do not allege any of the individual plaintiffs are in a protected class, neither of them has rights under the statute. They cannot support a private cause of action. Likewise, because organizational plaintiffs are not voters, they too lack a private cause of action.

## IV. The Court should abstain from ruling on the merits until related state-court litigation is resolved.

Additionally, resolution of Plaintiffs' federal claims is subject to a predicate question of state law: namely, whether the state constitution permits the Texas Governor to suspend the Election Code at all. That question is squarely presented in state court litigation currently before the Supreme Court of Texas. *See*, *e.g.*, *In re Hotze*, No. 20-0751 (filed Sept. 27, 2020); *In re Hotze*, No. 20-0739 (filed Sept. 28, 2020)). The court has specifically requested that the State file separate briefing on the merits that addresses not only the Governor's power to suspend the law generally, but that power's application to Section 86.006. *See* Supr. Ct. of Tex. Requested Response, *In re Hotze*, No. 20-0751 (filed Sept. 28, 2020).

In light of this uncertainty about a predicate question of state law, this Court should abstain under *Railroad Commission of Texas v. Pullman*, 312 U.S. 496 (1941). "The *Pullman* case establishes two prerequisites for *Pullman* abstention: (1) there must be an unsettled issue of state law; and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised." *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980). Each of these prerequisites is satisfied here.

The proclamations rest on the Governor's power to suspend "any regulatory statute prescribing the procedures for conduct of state business." TEX. GOV'T. CODE § 418.016. State-court

litigants are currently challenging whether Section 418.016 is compatible with delegation limits in the Texas Constitution. *In re Hotze*, No. 20-0430, 2020 WL 4046034, at *2 (Tex. July 17, 2020) (Devine, J., concurring). The issue is therefore not yet settled.

Were the Supreme Court of Texas to strike down that provision of the Disaster Act as an improper delegation, its ruling would put Plaintiffs' claims "in a different posture," if not moot them entirely. That is because if the *In re Hotze* plaintiffs prevail in state court, then the challenged Proclamation would not have the force of law. Early voting procedures would be governed by Section 86.006(a-1), which, Plaintiffs contend, already permits the early voting clerk to organize multiple mail-in ballot, delivery locations per county on election day. *See* ECF 16 ¶¶ 48–49.

In that event, there would be no need for this Court to rule on Plaintiffs' federal claims. *See, e.g., Pullman*, 312 U.S. at 501 ("If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation; the constitutional issue does not arise."). As the U.S. Supreme Court has explained, "[i]f the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling or otherwise significantly modify the federal claim, the argument for abstention is strong." *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 84 (1975); *see also Pullman*, 312 U.S. at 499–500 ("[N]o matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination" because "[t]he last word on the meaning of" Texas law belongs "to the supreme court of Texas." ).

That the statute in need of state-court clarification is not being challenged in this case is immaterial. But for Section 418.016, the Governor could not issue the Proclamation which suspended Section 86.006(a-1). A determination that it exceeded the state constitution, by necessity, resolves Plaintiffs' the alleged injury. "[W]here the challenged statute is part of an integrated scheme of related constitutional provisions, statutes, and regulations, and where the scheme as a whole calls for clarifying interpretation by the state courts, we have regularly required the district courts to abstain." *Moore*, 420

U.S. at 84 n.8 (1975). This case therefore presents an almost textbook illustration of the *Pullman* abstention doctrine. *Moore*, 420 U.S. at 84 ("Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law.").

Indeed, in many respects, the case resembles the situation presented in *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020). There, the district court considered a constitutional challenge over Texas's failure to extend mail-in voting to all voters in response the COVID-19 pandemic. Although the court's analysis turned on the interpretation of "disability" in Section 82.002 of the Election Code, the district court decided to proceed without waiting for guidance from the Supreme Court of Texas, which was, at the time, deliberating that very issue. On appeal, the Fifth Circuit chastened the district court's decision as "not well considered." *Id.* at 397 n.13. This is because the "forthcoming interpretation of state law could have made any federal constitutional ruling 'unnecessary.'" *Id.* at 417 (Costa, J., concurring) (quoting *Pullman*, 312 U.S. at 500). "The timing of the parallel litigation [also] made this such a strong case for abstaining." *Id.* at 418 (Costa, J., concurring).

## Conclusion

The Governor and the Secretary respectfully request that the Court dismiss Plaintiffs' Complaint.

Date: October 6, 2020

KEN PAXTON
Attorney General of Texas

RYAN L. BANGERT
Deputy First Assistant Attorney General

Respectfully Submitted.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Associate Deputy for Special Litigation

TODD LAWRENCE DISHER
Deputy Chief for Special Litigation

WILLIAM T. THOMPSON
Special Counsel

ERIC A. HUDSON
Special Counsel

KATHLEEN T. HUNKER
Special Counsel

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
todd.disher@oag.texas.gov
will.thompson@oag.texas.gov
eric.hudson@oag.texas.gov
kathleen.hunker@oag.texas.gov

**COUNSEL FOR THE GOVERNOR OF TEXAS AND THE TEXAS SECRETARY OF STATE**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 6, 2020, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Associate Deputy for Special Litigation